Pamela J. TORRE, and Pamela J. Torre
as natural guardian and next friend
of Trisha B. Torre, Plaintiffs,

v.

FEDERATED MUTUAL INSURANCE COMPANY, Federated Mutual Insurance Company Medical Plan # 501; William Haegele, a/k/a Bill Haegele, Regional Manager; Thomas Lauritzen, a/k/a Tom Lauritzen, Federated Mutual Insurance Company District Manager; John Cummings, individually; William Haegele, a/k/a Bill Haegele, individually; Thomas Lauritzen, a/k/a Tom Lauritzen, individually, Defendants.

Civ. A. No. 91–4235–DES.

United States District Court,
D. Kansas.

May 31, 1994.

796

Cheryl D. Myers, Michael B. Myers, Myers & Myers, Topeka, KS, for plaintiffs.

Arthur E. Palmer, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, R. Scott Davies, Minneapolis, MN, for defendants.

### MEMORANDUM AND ORDER

SAFFELS, Senior District Judge.

## I. INTRODUCTION

This matter is before the court on the parties' motions for summary judgment. In this action, plaintiffs claim the following: (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964; (2) violation of the Employee Retirement Income Security Act of 1974 ("ERISA"); (3) discrimination in violation of Minnesota Statutes Chapter 62A; (4) breach of employment contract; Minnesota Statutes Chapter 62A; (4) breach of employment contract; (5) intentional infliction of emotional distress; and (6) tortious interference with prospective business advantage.[1]

Defendants move for summary judgment as to each of the six numbered claims. Plaintiffs move for summary judgment as to only the claims numbered (1)–(4). Plaintiffs also object to defendants' reply to plaintiffs' response to defendants' motion for summary judgment.

## II. BACKGROUND

The parties' summary judgment motions generated a formidable quantity of factual submissions.[2] The court has attempted to distill the material facts from these voluminous submissions.

The parties organized their submissions by cause of action. To the extent possible, the court adheres to this organization.

### A. The Employment Contract

On February 10, 1988, in Topeka, Kansas, Pamela J. Torre ("Mrs. Torre") signed a writing entitled "Marketing Representative's Employment Contract". The "Marketing Representative's Employment Contract" contained a "Territory Assignment" which provided that "[y]our assigned territory is as follows: Counties of Lyon, Chase, Coffey, Greenwood, Osage (except the cities of Overbrook, Carbondale, and Scranton), Marion (except the town of Goessel), and Woodson: all in the State of Kansas. Also includes Shawnee County."

On April 14, 1988, Federated Mutual Insurance Company ("Federated") sent Mrs. Torre a "Territory Assignment Correction." In the "Territory Assignment Correction," Federated informed her that her original territory assignment incorrectly included all of Shawnee County. The "Territory Assignment Correction" specified that she was to be assigned only Topeka and not all of Shawnee County.

Like Mrs. Torre, Jeff Richardson ("Mr. Richardson") was a Marketing Representative for Federated. Mr. Richardson signed his employment contract with Federated on June 1, 1988. Federated also assigned him the Topeka territory.

Mrs. Torre was not allowed to call on accounts in Topeka until Stephen Rohr, her

---

1. In the pretrial order, Mrs. Torre contends that Mr. Haegele and Mr. Lauritzen intentionally interfered with her prospective business advantage by "deliberately and wrongfully inflat[ing] price quotes to impair her business relationship with her insurance clients and prospective insurance clients." Pretrial Order, filed April 15, 1994, at p. 16. She does not contend tortious interference with contract. Tortious interference with contract has been excluded from the pretrial order. See Hullman v. Board of Trustees of Pratt Com. College, 950 F.2d 665, 667 (10th Cir.1991) (writing that "[t]he pretrial order supersedes the pleadings and controls the subsequent course of litigation. Fed.R.Civ.P. 16(e). The trial court has the discretion to exclude from trial those issues and claims not found in the pretrial order") (quoting Hullman v. Board of Trustees of Pratt Com. College, 732 F.Supp. 91, 93 (D.Kan. 1990)). Accordingly, the court examines only intentional interference with prospective business advantage.

2. In particular, plaintiffs' statement of "Rule 206(c)" facts is somewhat overwhelming. It consists of 458 numbered, single-spaced paragraphs, not including subparagraphs, which consume nearly 50 pages of their memorandum in support of summary judgment.

former District Marketing Manager, gave her a list of prospects. Mrs. Torre received a list of prospects in fall of 1988. The list contained no renewal business. It contained names of only new business prospects. Mr. Richardson received the renewal business in Topeka.

In April of 1990, Tom Lauritzen ("Mr. Lauritzen"), her District Marketing Manager, Mrs. Torre, and Mr. Richardson had a meeting at which they discussed the division of the Topeka territory. Mr. Lauritzen decided to divide the territory by zip code. Mrs. Torre objected to the division. She notified Mr. Lauritzen of her objections.

Mr. Lauritzen did not review the quality of the prospects either before or after the division. He only reviewed the classes of businesses on the zip code list to determine whether there was a good division of business.

The division gave Mr. Richardson a larger renewal base in Topeka. Additionally, the division gave Mr. Richardson the majority of the large Topeka based contractors.

On June 13, 1990, Mrs. Torre wrote to Mr. Lauritzen complaining of the following: (1) being given less than 25 percent of the Topeka territory; (2) having to maintain an office in Topeka; and (3) the April 14, 1988, reduction in her territory. She concluded her letter by requesting that Mr. Lauritzen explain why she had to share an office with Mr. Richardson in Topeka, yet she was given less than one-half of the Topeka territory.

In his reply, Mr. Lauritzen explained that the division was made on Mrs. Torre's suggestion and increased her prospects in Topeka. He also agreed that her contract included Shawnee County.

Mrs. Torre also wrote letters to William Haegele ("Mr. Haegele"), the Regional Marketing Manager, regarding the division. In March of 1991, Mr. Haegele and Mrs. Torre met in Kansas City where they discussed the territory division, her income from the Topeka accounts, her overall income, and the possibility of a promotion or transfer. Mrs.

Torre was dissatisfied with her income because of her low renewal base and overhead.

On June 5, 1991, Mr. Haegele wrote to Mr. Lauritzen regarding the division. He suggested a division not based on zip code. Mr. Lauritzen did not implement Mr. Haegele's suggestion.

## B. *Sex Discrimination*

Mrs. Torre was a successful Marketing Representative. Her superiors at Federated consistently praised her work and sales production. She received various awards for the quality of her work and the amount of business she produced.

Federated does not have a written policy regarding promotions or transfers. It is not company policy to take applications for promotions or transfers. It is Federated's practice to promote Marketing Representatives within their own respective regions.

Federated's procedure regarding promotions or transfers is for the Marketing Representative to contact her supervisor and request a promotion. The request then proceeds through marketing management channels until it ultimately arrives at the Human Resources Department.

Federated does not post job openings or circulate a written notice of opportunities for promotion or transfer. Nor does it have a standard procedure for informing Marketing Representatives about openings or opportunities for promotion or transfer.

Federated's practice is to have District and Regional Marketing Managers and Directors of Field Operations look for promotable Marketing Representatives. Mr. Lauritzen, as a District Marketing Manager, has a financial incentive to hire promotable people.

Generally, Federated prefers that a Marketing Representative have two or three years of experience before promotion. However, Federated has promoted Marketing Representatives with less experience.[3]

---

**3.** For example, three of Mrs. Torre's superiors were promoted in less than two years: (1) James Leighty, one year, nine months; (2) Steve Rohr, one year, nine months; and (3) Jock Kinnett, one year, six to eight months.

Mrs. Torre first requested promotion or transfer in a May 24, 1989, letter to Jock Kinnett, Director of Field Operations.

On January 15, 1990, she sent a letter to Mr. Lauritzen in which she asked to be considered for a position in Federated's Phoenix office. During her March 1991 meeting with Mr. Haegele in Kansas City, she further expressed her interest in a Human Resources position in Federated's Phoenix office. Mrs. Torre specifically requested Phoenix because of its proximity to several treatment facilities for her daughter, Trisha.

In 1991, Kirk Nelson, Federated's President, learned that Mrs. Torre was interested in a promotion or transfer. Albert Anexstad, Senior Vice–President of Marketing, does not know if Mrs. Torre was considered during 1989–92 for any District Marketing Manager or Account Executive openings.

In 1992, Federated hired a new Corporate Human Resources Manager. The opening was not listed or posted.

During Mrs. Torre's employment with Federated, the company promoted Marketing Representatives with the same or less tenure and the same or lower sales production as Mrs. Torre.

James Sheard, former Federated President and current Director of Human Resources, set up Federated's career assessment program. Federated uses the career assessment in its evaluation of candidates for promotion. Most of the Marketing Representatives who received a promotion first received a career assessment.

Career assessments are done by referral from a Marketing Representative's District or Regional Marketing Manager or Director of Field Operations.

In the fall of 1989, Mrs. Torre explained to Mr. Rohr that she was unaware of what positions were available and mentioned that she wanted to explore her options. Mr. Rohr indicated that arrangements would be made for her to have a career assessment in the coming spring. She did not receive the assessment in the spring of 1990.

James Leighty became Director of Field Operations on January 1, 1991. While Director, Mr. Leighty and Mr. Haegele discussed Mrs. Torre's situation. Mr. Leighty was aware Mrs. Torre had filed a discrimination suit against the company. As a result, he sent her management appraisal form to Federated's in-house counsel. At a later date, Mr. Leighty decided not to pursue Mrs. Torre further as a candidate for promotion or transfer because it was his understanding that she was no longer willing to accept a change.

As previously noted, Mrs. Torre maintained an office in Topeka with Mr. Richardson. She and Mr. Richardson shared the office expenses equally and Federated reimbursed them equally for a portion of the office expenses. The office was 45 minutes from her home. No other Marketing Representative in her District maintained an office as far away from home.

The Leadership Council Award is given once a year on the recommendation of a Marketing Representative's District Marketing Manager and the approval of the Regional Marketing Manager. An award winner receives recognition in the company flyer, which is distributed to clients, the company newsletter, and the local newspaper. Mrs. Torre won in 1989 and 1990 but not 1991. In 1991, Mr. Richardson won even though he had less production.

In 1989 and 1990, Mrs. Torre won the Big Hitter Award for excellence in production. In 1989, she and the other winners from her region received public recognition at the annual "kick-off meeting." In 1990, she was the only winner from her region and she received no public recognition. Mr. Haegele did not give her the award at the meeting because he was embarrassed that only one of his Marketing Representatives qualified.

Federated's District Marketing Manual directs managers interviewing prospective Marketing Representatives to make a home visit to "[s]ee how the housekeeping is, the behavior of the children, and the attitude of the wife."

Federated gave blazers to Marketing Representatives who made the President's Council. It ordered the blazers from a men's clothier. The blazers were cut in a way that

allowed males, but not females, to select from ready-made blazers. Instead, Federated gave females $150 to purchase matching blazers elsewhere.

## C. *ERISA: Benefits Claim*

The Federated welfare benefit plan at issue, Plan # 501, has lifetime maximum coverage limits of $1,000,000 for medical conditions and $50,000 for mental/nervous conditions. Federated issued the policy that is Plan # 501. Federated also is the ERISA Administrator.

Plan # 501 defines mental illness as follows: "Mental Illness means a mental disorder or a functional nervous disorder and includes psychiatric or psychological treatment of any physical condition."

Trisha Torre ("Trisha") was born in 1978. She was three months premature and weighed two pounds thirteen ounces. She had underdeveloped lungs and heart valve problems and was in intensive care for many weeks following her birth. She had heart surgery at the age of one and one-half years. She later became hyperactive and would not sleep. At age three, a neurologist diagnosed her as having a neurological condition.

In November of 1989, Trisha was admitted to the Menninger Clinic ("Menninger") in Topeka, Kansas. In December of 1989, she was diagnosed with organic personality syndrome with symptoms manifested in behavioral and emotional problems. In late 1989, Menninger's staff recommended that Trisha be placed in a long-term residential treatment facility.

Menninger sent bills to Federated bearing diagnosis codes from the mental disorders section of the *International Classification of Diseases*, 9th Edition. Federated initially allocated the expenses to Plan # 501's mental/nervous limits. However, on January 23, 1990, after reviewing the expenses with Menninger personnel and Dr. Jerry Tomasovic, Trisha's treating physician at the Laurel Ridge Hospital in San Antonio, Texas, Federated reallocated the expenses to Plan # 501's medical limits.

On January 3, 1990, Trisha was admitted to the acute care unit of Laurel Ridge Hospital in San Antonio, Texas. Federated conducted an ongoing evaluation with respect to payable benefits. On January 8, 1990, as part of its ongoing evaluation, Federated sent medical reports from Menninger to the Texas Medical Foundation ("TMF"), a peer review group, and requested that a psychiatrist review Trisha's claim. In its correspondence to TMF, Federated inquired as to Trisha's diagnosis and the nature of her treatment. Federated provided TMF with Plan # 501's definition of "mental illness."

After receiving TMF's response, Federated allocated all the expenses Trisha incurred at Laurel Ridge through January 29, 1990, to Plan # 501's medical limits.

As previously noted, Dr. Tomasovic was Trisha's treating physician at Laurel Ridge. He is a pediatric neurologist. He diagnosed Trisha with aphasia[4] and brain frontal lobe and craniofacial abnormalities. In his opinion, Trisha's condition is medical, not mental, and is akin to a stroke.

In consultation with his team at Laurel Ridge, Dr. Tomasovic put together an initial treatment plan for Trisha in early January of 1990. There were many modifications to this plan.

Dr. Wiley Jordan ("Dr. Jordan") is a psychiatrist and advisor with TMF. He reviewed Trisha's case for Federated. However, he never saw Trisha's medical records. Dr. Jordan assumed Dr. Tomasovic was a psychiatrist working in a psychiatric ward at Laurel Ridge. He never reviewed Dr. Tomasovic's written treatment plan. Based in part on conversations with Dr. Tomasovic, Dr. Jordan informed Federated that Laurel Ridge was providing Trisha with psychological treatment. After considering Dr. Jordan's review and the codes on Trisha's bills, Federated allocated Trisha's expenses from Laurel Ridge to Plan # 501's mental/nervous limits.

Dr. Jordan reviewed the medical necessity of Trisha's continued stay at Laurel Ridge. He periodically discussed the issue with Dr. Tomasovic. Dr. Jordan approved the medi-

---

4. Dr. Tomasovic explained that aphasia is a se- vere developmental language disorder.

cal necessity of Trisha's continued stay at Laurel Ridge subject to his receipt of additional information regarding her condition and progress. He granted several extensions based on Dr. Tomasovic's opinion that she was making progress under the treatment.

Mrs. Torre objected to Federated's allocation of Trisha's Laurel Ridge expenses to Plan # 501's mental/nervous limits. On numerous occasions, Mrs. Torre and Laurel Ridge expressed to Federated their belief that since Trisha's condition was organic brain syndrome, which is physical and not mental in nature, her expenses should be allocated to Plan # 501's medical limits. Federated explained that the basis for its allocation was that "mental illness" includes "psychiatric and psychological treatment of any physical condition."

Laurel Ridge also expressed concern about Federated's reliance on a psychiatrist instead of a pediatric neurologist to review Trisha's case. Mrs. Torre filed complaints with the Minnesota and Kansas Insurance Commissioners. The Kansas Insurance Commissioner investigated and suggested Federated have a pediatric neurologist review Trisha's case.

On March 7, 1990, a second TMF psychiatrist, Dr. Tracy Gordy ("Dr. Gordy"), reviewed Trisha's case. Dr. Gordy concurred with Dr. Jordan's earlier opinion.

On April 22, 1990, Trisha was discharged from Laurel Ridge. Dr. Tomasovic believed she was in no serious danger at this time. He also believed it was appropriate for her to move to a residential treatment program.

In July of 1990, TMF had a pediatric neurologist review Trisha's case.[5] The pediatric neurologist concluded that the length of stay and nature of treatment at Laurel Ridge were due to neurological disease and were justified. The pediatric neurologist also concluded that Dr. Tomasovic had provided appropriate care "by medical means,

drugs, and treatments (speech therapy, behavioral modification techniques)."

In August of 1990, Federated reallocated the Laurel Ridge expenses to Plan # 501's medical limits.

Laurel Ridge referred Trisha to the Davison School in Atlanta, Georgia. Sometime following Trisha's discharge from Laurel Ridge, Mrs. Torre enrolled her in the Davison School. Mrs. Torre did not pre-certify Trisha's admission with Federated. Federated paid the expenses Trisha incurred at the Davison School which it determined were medical but not those it determined were merely educational.

Mrs. Torre removed Trisha From the Davison School on July 19, 1992.

### D. ERISA: Discrimination Claim

In support of her ERISA discrimination claim, Mrs. Torre realleges the acts which form the basis of her Title VII claim.

### III. SUMMARY JUDGMENT STANDARD

A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1985). The substantive law identifies which issues are material. *Id.* at 248, 106 S.Ct. at 2510. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* Only genuine disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment. *Id.*

---

5. TMF hired three consulting doctors to review Trisha's case: two psychiatrists and one pediatric neurologist. TMF matches a consulting doctor's specialty to a client's request. Federated requested an initial review by a psychiatrist, done by Dr. Jordan, and a second opinion by a psychiatrist, done by Dr. Gordy. Federated did not request an opinion by a pediatric neurologist until June 28, 1990.

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat. Laboratory,* 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the [nonmovant's] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. at 2552–53. Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1985). The nonmovant must go beyond the pleadings and, by affidavits or the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is some genuine issue for trial. Fed. R.Civ.P. 56(c). *See also Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (interpreting 56(e)).

Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. at 2552–53.

When examining a motion for summary judgment, the court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues").

Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. That is, the court decides whether there are any genuine factual issues that can be resolved only by a trier of fact because they reasonably may be resolved in favor of either party. *Id.*

## IV. DISCUSSION

The "Discussion" is divided into eight sections: A–H. In the first seven sections, sections A–G, the court examines the parties' summary judgment motions by cause of action. In the eighth section, section H, the court addresses plaintiffs' objection.

As previously noted, plaintiff claims the following: (1) sex discrimination; (2) violation of ERISA (3) discrimination in violation of Minnesota Statutes Chapter 62A; (4) breach of employment contract; (5) intentional infliction of emotional distress; and (6) tortious interference with prospective business advantage. Defendants move for summary judgment as to each of the six numbered claims. Plaintiffs move for summary judgment as to only the claims numbered (1)–(4). Additionally, plaintiffs object to defendants' reply to plaintiffs' response to defendants' motion for summary judgment.

### A. *Sex Discrimination*

Title VII proscribes discriminatory employment practices and decisions as set forth at 42 U.S.C. § 2000e–2(a) which states as follows:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

An employer may violate Title VII by either overt acts of discrimination or employment policies and practices that are neutral on their face and in intent, but that nonethe-

less discriminate in effect against a particular group. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 349, 97 S.Ct. 1843, 1861–62, 52 L.Ed.2d 396 (1977). Accordingly, a Title VII violation can be shown under two distinct theories: (1) disparate treatment; or (2) disparate impact.

Disparate treatment occurs when an employer treats a particular employee less favorably than others because of that employee's protected status. *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1236 (10th Cir. 1991); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir.1991). A disparate impact claim exists when an employer's practices, although basically neutral on their face, fall more harshly on one group than another. *Id.*

Mrs. Torre pursues her Title VII claim under both the disparate treatment and disparate impact theories. She also claims retaliation in violation of 42 U.S.C. § 2000e–3(a). The court addresses each theory separately.

### 1. Disparate Treatment

Under a disparate treatment theory, Mrs. Torre must show that, compared with other similarly situated employees, she was treated differently because of her sex. *See Drake*, 927 F.2d at 1160 (writing that "[u]nder the disparate treatment theory, the thrust of plaintiff's case is that, compared with other like-qualified applicants, plaintiff was treated differently because of his race"). This theory does not attack an employment practice itself, but only the allegedly discriminatory application of that practice. *See Id.*

Mrs. Torre has the ultimate burden of proving intentional discrimination. She may carry this burden by presenting either direct or indirect evidence of defendants' discriminatory intent. *See, e.g., E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir.1992); *Thompson v. La Petite Academy, Inc.*, 838

F.Supp. 1474, 1478 (D.Kan.1993). She has presented no direct evidence. Thus, she must prove her case with indirect evidence.

■■■ In *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court provided a framework which enables a plaintiff to establish intentional discrimination despite having no direct evidence. Mrs. Torre must first establish, by a preponderance of the evidence, a prima facie case of sex discrimination. *See St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). Once she establishes her prima facie case, Mrs. Torre creates a presumption of unlawful discrimination. *See Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. Defendants must then rebut this presumption by producing evidence that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." *See Id.* To carry their burden of production, defendants " 'must clearly set forth, through the introduction of admissible evidence,' [a] reason[ ] for [their] actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *See St. Mary's Honor Center*, —— U.S. at ——, 113 S.Ct. at 2747 (quoting *Burdine* 450 U.S. at 254–55, 101 S.Ct. at 1094–95).[6] Although by establishing her prima facie case Mrs. Torre shifts the burden of production to defendants, she retains at all times the ultimate burden of persuading the trier of fact that defendants intentionally discriminated against her because of her sex. *See Id.*

■ Once defendants meet their burden of production, and thereby rebut Mrs. Torre's prima facie case, the initial presumption of intentional discrimination "simply drops out of the picture." [7] *See Id.* (quoting *Burdine*,

---

6. Defendants need not persuade the court they were actually motivated by the proffered reasons. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. *See also Flasher*, 986 F.2d at 1316 n. 4 & 1317–18 (explaining the employer's step two burden).

7. After an employer meets its burden of production, "the factual inquiry proceeds to a new level

of specificity." *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1095. "[T]he inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced." *St. Mary's Honor Center*, —— U.S. at ——, 113 S.Ct. at 2752. An employee's demon-

450 U.S. at 255, 101 S.Ct. at 1094–95). At this point, Mrs. Torre has the opportunity to show that defendants' proffered reason was not the true reason but was merely a pretext for discrimination. *See Id.* It is important to note that the ultimate question is whether defendants intentionally discriminated against her. The fact finder's rejection of defendants' proffered reason, taken together with her prima facie case, may permit a finding of intentional discrimination. However, the finder's rejection of defendants' proffered reason, without more, does not compel a finding in favor of Mrs. Torre. That is, defendants' proffered reason "cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *See Id.* at ——, 113 S.Ct. at 2752 (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093). *Cf. Flasher*, 986 F.2d at 1321 (writing that "Title VII only reaches pretextual cases where the advanced reason is shown to be a pretext for a discriminatory animus based upon a person's protected status"). Thus, it is not enough to disbelieve defendants; the finder must believe Mrs. Torre's explanation of intentional sex discrimination. *See St. Mary's Honor Center*, —— U.S. at ——, 113 S.Ct. at 2754.

Having reviewed the *McDonnell Douglas/Burdine* framework, the court now turns to an application of that framework. At the first step, Mrs. Torre must establish her prima facie case. Mrs. Torre alleges a variety of acts which she contends constitute unlawful sex discrimination.[8] The court examines these acts in the following two parts: (1) failure to promote or transfer; and (2) discrimination in the terms and conditions of employment.

■ To establish her prima facie case of discriminatory failure to promote or transfer, Mrs. Torre must prove that she (1) is a member of a protected group, (2) was qualified for an available position, and (3) was rejected under circumstances that give rise

to an inference of unlawful discrimination in that her failure to be promoted or transferred is more likely than not based on the consideration of impermissible factors. *Coe v. Yellow Freight System*, 646 F.2d 444, 448–49 (10th Cir.1981); *Payne v. General Motors Corp.*, 731 F.Supp. 1465, 1470 (D.Kan.1990). Defendants concede that Mrs. Torre satisfies the first prong. They argue that Mrs. Torre cannot establish the second or third prongs.

Federated has no formal application procedure for promotion or transfer. Indeed, it has no formal procedure for the dissemination of information to its employees regarding job openings. Managers are expected to review the ranks for promotable people who then are placed in line for management appraisals and career assessments. An employee also is able to initiate this process on her own by expressing interest to her superiors.

Mrs. Torre appears to have worked within Federated's amorphous system. The record clearly reflects that she made several inquiries about possible job openings. She expressed her desire to be considered for promotion or transfer to at least four of her superiors: (1) Mr. Kinnett; (2) Mr. Rohr; (3) Mr. Lauritzen; and (4) Mr. Haegele. The record also indicates that her superiors thought her to be an able Marketing Representative and promotable. However, Mrs. Torre was neither transferred nor promoted. In fact, her progress through Federated's pipeline for promotion or transfer was incomplete.

The court does not penalize Mrs. Torre for Federated's organizational structure. The court is persuaded that, within the system established and maintained by Federated, Mrs. Torre's repeated inquiries and her clear expression of her desire to be considered for promotion and transfer are sufficient to constitute an "application" for promotion or transfer.

---

stration that an employer's proffered reason is false is part of her proof that the real reason for the employer's action was intentional discrimination. *Id.* at ——, 113 S.Ct. at 2753.

**8.** Mrs. Torre points to the following acts: failing to promote or transfer her, forcing her to open a Topeka office, providing her with unreasonable price quotes, failing to give her the Leadership Council Award, and refusing to acknowledge publicly her receipt of the "Big Hitter" Award.

By finding that Mrs. Torre's actions are the equivalent of an application, the court faces a more difficult question: What is the scope of her application? Mrs. Torre clearly expressed a general interest in being promoted. She seems to argue that Federated's subsequent failure to respond to her general requests by promoting or transferring her to any managerial or supervisory position, at any geographic location, is sufficient to establish a prima facie case. The court disagrees.

Mrs. Torre's argument is simply too broad. She cites no authority to support her contention that general requests are tantamount to an application for any available position regardless of geographic location or job description. The prima facie case performs an important function: it eliminates the most common nondiscriminatory reasons for an employer's disparate treatment of a protected employee. *See Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1093–94 (writing that the function of the prima facie case is to "eliminate[ ] the most common nondiscriminatory reasons for the plaintiff's rejection"). As a result, once shown, the prima facie case creates a presumption of unlawful discrimination. However, to create a presumption of unlawful discrimination, the prima facie case, at the very least, must be based on circumstances which give rise to a reasonable inference of discrimination. Mrs. Torre makes her argument at such a high level of generality that the circumstances she alleges fail to support a reasonable inference of intentional discrimination based on her sex.

The court recognizes that the lack of a formal application procedure makes it more difficult for Mrs. Torre to prove a prima facie case. However, at the very least, Mrs. Torre must prove a basis from which the court may draw a reasonable inference of intentional discrimination. Mrs. Torre's allegations are simply too general. In short, it is neither reasonable nor practical to interpret her general expression of interest in promotion or transfer as an application for every available managerial or supervisory job whatever the nature and wherever the location. It is more reasonable to limit her expression of interest to those areas and for those jobs in which she expressed a particular interest. Additional-ly, insofar as it was Federated's company practice to promote from within a region, and given that she expressed her desire directly to Mr. Haegele, her Regional Marketing Manager, Mrs. Torre's general request reasonably can be viewed as a request for promotion or transfer to available positions within her region.

■ In a disparate treatment action, an employee claims that she was disfavored because of her Title VII protected status. *Flasher,* 986 F.2d at 1319. An essential part of the disparate treatment inquiry involves the comparison of an employer's treatment of plaintiff with that of similarly situated non-protected employees. *See, e.g., Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582–83 (6th Cir. 1992) (discussing, in a Title VII disparate treatment case, the general requirement that a plaintiff compare her treatment to that of similarly situated non-protected employees); *Magruder v. Runyon,* 844 F.Supp. 696, 702 (D.Kan.1994) (citing to and quoting from *Mitchell* ); *Mazzella v. RCA Global Communications, Inc.,* 642 F.Supp. 1531, 1546–47 (S.D.N.Y.1986), *aff'd,* 814 F.2d 653 (2d Cir. 1987) (writing that "for evidence relating to other employees to be relevant, those employees must be situated similarly to plaintiff"). At the prima facie stage, a plaintiff proves facts relevant to the comparison. In the instant case, Mrs. Torre produces no such evidence. Instead, she argues that "suitable" jobs opened and were filled with other employees, during the relevant time period. She gives little indication of what the jobs were, where they were located, what their requirements were, or what the qualifications of the people were who filled them. Her sole piece of comparative evidence is a "chart" listing thirteen males who were promoted with less tenure than she had. There is no indication, and no reasonable basis for inferring, that she was rejected for promotion or transfer in favor of any of the thirteen listed males or that they were promoted to jobs, and locations, in which she was interested. *Cf. Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 532 (10th Cir. 1994) (noting, in an ADEA case, that plaintiff's statistics were inappropriate because they were not based upon a comparative analysis of similarly situated individuals).

In *E.E.O.C. v. Flasher Co., Inc.*, a Title VII disparate treatment case, the Tenth Circuit explained as follows:

[Title VII] prohibits only intentional discrimination *based upon* an employee's protected class characteristics.

Human relationships are inherently complex. Large employers must deal with a multitude of employment decisions, involving different employees, different supervisors, different time periods, and an incredible array of facts that will inevitably differ even among seemingly similar situations. The law does not require, nor could it ever realistically require, employers to treat all of their employees all of the time in all matters with absolute, antiseptic, hindsight equality.

What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics. Discrimination based on ... sex ... is not only wrong, it is illegal. Proof of illegal discrimination *begins* in step one of the *McDonnell Douglas* analysis with proof that a protected person has been treated less favorably than other employees in comparable situations.

*Flasher*, 986 F.2d at 1319. Mrs. Torre presents no proof that she has been treated less favorably than other employees in comparable situations. Instead, she argues that jobs were available somewhere in the company and these jobs were filled by other employees. Her proof of illegal discrimination is insufficient to create a reasonable inference of intentional discrimination based upon her sex.

However, even assuming that Federated's internal procedures excuse the general nature of her claim, and assuming Mrs. Torre produced evidence sufficient to raise an inference of discrimination, the court is persuaded that, as a matter of law, she is unable to carry her ultimate burden. That is, the court is persuaded that defendants can rebut the presumption created by Mrs. Torre's prima facie case and, interpreting the record in

the light most favorable to Mrs. Torre, she cannot persuade a reasonable finder of fact that Federated intentionally discriminated against her because of her sex.[9]

■ Proceeding with the assumption that Mrs. Torre can establish her prima facie case, defendants now have the intermediate burden to show their failure to promote was based on legitimate, nondiscriminatory reasons. Defendants produce evidence sufficient to meet their intermediate burden. For example, defendants can show that Federated's practice allows employees to seek promotion or transfer by expressing interest to their supervisors and managers; Mrs. Torre made a general request for promotion or transfer; Federated's practice is to promote from within a region; and the only District Manager position which opened in Mr. Haegele's region was filled by a female. Defendants can also show that, apart from her general requests, Mrs. Torre expressed specific interest in several locations (Phoenix and Atlanta); defendants followed up on these requests by checking into possible openings at these locations; and that there were no supervisory positions available. Additionally, Mrs. Torre's summary judgment motion mentions a specific position which Federated gave to a male applicant: the Corporate Human Resources Services Manager position. She seems to argue that this position was both the type of position in which she expressed interest and for which she was particularly well-qualified. In response, defendants have produced evidence showing that the individual who filled the position, although male, was qualified.

■ Since defendants can rebut the presumption created by a prima facie showing, the presumption "simply drops out of the picture." At this point, Mrs. Torre may satisfy her ultimate burden by demonstrating that defendants' proffered reason is a pretext for unlawful sex discrimination. After reviewing the record in the light most favorable to Mrs. Torre, the court is convinced no reasonable finder of fact could conclude that

---

**9.** It is well established that a plaintiff is not insulated from summary judgment merely because she has established a prima facie case. *Hooks v. Diamond Crystal Specialty Foods, Inc.,*

997 F.2d 793, 798 (10th Cir.1993); *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1121 (10th Cir.1991).

defendants' failure to promote or transfer her was motivated by her sex.

At most, the record shows that there were supervisory or management positions open in some regions that Federated filled with other employees. Mrs. Torre points the court to no openings in the Central Region or the geographic locations in which she expressed specific interest (Phoenix or Atlanta) that Federated filled with males who were equally or less qualified than she. Indeed, she simply can point to no specific job to which she was denied promotion or transfer because of her sex.

The essence of a disparate treatment claim is that the employer intentionally discriminated against the employee based upon protected characteristics. *See, e.g., E.E.O.C. v. Flasher Co., Inc.,* 986 F.2d 1312, 1319 (10th Cir.1992). Her general argument lacks any reference to the comparative element that forces a plaintiff to distill from her general grievances specific instances of intentional discrimination. *See Id.*

With respect to the Corporate Human Resources Services Manager position, Mrs. Torre seems to argue that the court may infer discrimination from the lack of formal posting of the opening, the lack of an articulated, formal application procedure, and the fact that Federated ultimately selected a male. Mrs. Torre does not argue, and the record does not reflect, that the male chosen was unqualified or that his selection was without a sound basis. This argument, without more, is insufficient to satisfy her burden. *Cf. Kachel v. City of Pueblo,* 743 F.Supp. 749, 755 (D.Colo.1990), *aff'd,* 945 F.2d 411 (10th Cir.1991) (noting that

"[s]tanding alone, the selection of a male over a female where both are qualified will simply not sustain an inference of discrimination").

Mrs. Torre also attempts to establish unlawful discrimination by pointing to (1) statistical evidence and (2) what she characterizes as Federated's pervasive atmosphere of discrimination against females. Neither argument is sufficient to avoid summary judgment.

First, she attempts to establish her claim by producing statistical evidence that defendants apply their policy in a discriminatory manner.[10] Statistical evidence is to be closely related to the specific issue presented. *Fallis v. Kerr–McGee Corp.,* 944 F.2d 743, 746 (10th Cir.1991); *Kachel,* 743 F.Supp. at 755 (citing *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 346 (10th Cir.1975); *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263, 272 (10th Cir.1975)). In *Cone v. Longmont United Hospital Ass'n,* the Tenth Circuit explained that such evidence "must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between *comparable* individuals." *Cone,* 14 F.3d at 532 (internal quotation marks omitted) (quoting *Fallis,* 944 F.2d at 746). Mrs. Torre's statistical evidence does not illuminate the issue here. The court finds that, due in part to the loosely defined nature of Mrs. Torre's failure to promote claim, the statistical evidence presented is insufficient to create a reasonable inference of sex discrimination.

Second, she attempts to establish her claim by alleging pervasive sexual bias. Specifically, she points to various acts during her training session,[11] several comments during

10. For example, in her memoranda, she cites to a chart intended to reflect that 13 males, with qualifications equal to or less than Mrs. Torre's, were promoted during the time she sought promotion or transfer. The chart reflects the ill-defined nature of her claim. None of the promotions are identified with a geographic region. Some of the entries fail to describe the job to which the subject was promoted. None of the entries mention the requirements of the job to which the subject was promoted. Additionally, the chart fails to establish a relationship between these promotions and unlawful sex discrimination. Her chart provides only a portion of what a finder would need to support an inference that defendants applied company policy unlawfully.

In short, the chart demonstrates that some males were promoted to some positions at some geographic locations. That Federated promoted some males to some positions at some geographic locations is insufficient to establish intentional discrimination against Mrs. Torre. Further, that some males were promoted to some jobs in some regions does not support a general inference of sexual bias.

11. Some of the acts she points to are as follows: at her training session females were provided different accommodations than males, some males went to "strip bars" on their free time, the trainers showed a film of a man defecating, some

the same training session,[12] and Federated's failure to provide female employees with ready-made blazers. Even viewing the record in the light most favorable to Mrs. Torre, the acts at the training session and her complaints regarding the blazers are isolated incidents which bear only a questionable relationship to criteria her employers may have used when making decisions on promotions and transfers. Similarly, even assuming the comments are admissible, she does not tie them to a supervisor or anyone involved with the decisional process. *Cf. Hong v. Children's Memorial Hospital,* 993 F.2d 1257, 1266 (7th Cir.1993) (noting that slurs directed at a plaintiff's Title VII protected status are generally not enough to support a claim and explaining that "such remarks, when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria"). Mrs. Torre's tenuous argument based on defendants' alleged sexual bias is insufficient to avoid summary judgment.

In summary, the court finds that Mrs. Torre has failed to establish that she was rejected under circumstances which give rise to an inference of unlawful discrimination. The court further finds that even if Mrs. Torre's global claim is sufficient to satisfy the relatively lax showing required to make a prima facie case, she nevertheless is unable to satisfy her ultimate burden. That is, Mrs. Torre, as a matter of law, is unable to show that defendants' failure to promote or transfer her was motivated by her sex. Her mere conjecture that defendants engaged in intentional discrimination is an insufficient basis for denial of summary judgment. *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988); *Montgomery v. Card,* 794 F.Supp. 1066, 1068 (D.Kan.1992). Therefore, the court grants defendants' motion for summary judgment on her failure to promote or transfer claim.

▆▆▆ Mrs. Torre also alleges that defendants unlawfully discriminated against her by (1) forcing her to maintain a Topeka office, (2) providing her with unreasonable price quotes, (3) withholding the Leadership Council award, and (4) failing to acknowledge publicly her receipt of the "Big Hitter" Award. The court analyzes these allegations under the standard used for discrimination in the terms and conditions of employment. To establish her prima facie case, she must prove that (1) she was a member of a protected group, (2) she was entitled to the desired terms and conditions of employment, (3) her employer denied her the desired terms and conditions of employment, and (4) nonprotected employees were granted the desired terms and conditions of employment. *Boyd v. Telecable of Overland Park, Inc.,* 752 F.Supp. 388, 392 (D.Kan.1990); *Moore v. Norfolk and Western Ry. Co.,* 731 F.Supp. 1015, 1019 (D.Kan.1990). Again, defendants restrict their arguments to the second, third, and fourth prongs of the test.

With regard to her "Topeka office" contention, Mrs. Torre fails the fourth prong and, therefore, is unable to establish her prima facie case. Essentially, the fourth prong requires Mrs. Torre to make her initial showing that males were treated differently with respect to the "term or condition" at issue. Thus, the fourth prong requires her to frame her claim by providing a relevant comparison. In the instant case, Mrs. Torre cannot show disparate treatment based on her sex because her male counterpart in Topeka also was subjected to the same treatment she claims to have been discriminatory. The Topeka office was occupied by the two Marketing Representatives who were jointly responsible for the Topeka territory: Mrs. Torre and Mr. Richardson. As the other Marketing Representative assigned to the Topeka territory, Mr. Richardson is a similarly situated male. The two shared office expenses evenly, and to the extent Federated reimbursed them for their expenses, they were reimbursed equally. Mrs. Torre has failed to make an initial showing sufficient to

---

training techniques were based on analogies to sports, and she was unable to get a pool vehicle.

**12.** She points to several comments. First, another Marketing Representative stated she could go along to a "strip bar" so she could "learn a new trade." Second, a photograph was circulated of a nude male and comments were made by unidentified trainees that Mr. Rohr "could handle it."

give rise to an inference of intentional discrimination.

Mrs. Torre next argues that defendants supplied her with unreasonable price quotes in an attempt to cause her to lose business. She contends that she received "inflated" and "unreasonable" quotes but she bases her contentions on nothing more than her subjective belief. Her evidence establishes that she lost business to lower priced competitors. Her evidence also establishes that she complained to Federated about the quotes she was receiving. However, she provides no comparative evidence.[13] That is, she provides no evidence that the quotes she received were different than those supplied to similarly situated male Marketing Representatives. Her simple belief that she was discriminated against does not support a reasonable inference of intentional discrimination. Mere conjecture that an employer engaged in intentional discrimination is an insufficient basis for the denial of summary judgment. *Branson*, 853 F.2d at 772; *Montgomery*, 794 F.Supp. at 1068. In short, Mrs. Torre supplies no evidence sufficient to support a reasonable inference of intentional discrimination. Her claim rests solely on her unsupported assertion that she received "unreasonable" and "inflated" quotes. The court finds that she fails to establish the third and fourth prongs of her prima facie case.

Mrs. Torre also challenges defendants' failure to give her the Leadership Council Award in 1991 and publicly recognize her receipt of the "Big Hitter" Award. After examining the parties' memoranda, and the record submitted, the court concludes that there remain genuine issues of fact as to both claims.

Mrs. Torre argues that defendants failed to give her the Leadership Council Award in 1991 because of her sex. It is clear that Mr. Richardson received the Award in April of 1991. However, the basis for the Award is unclear.[14] Mrs. Torre argues that her sales production entitled her to be chosen instead of Mr. Richardson, who had a lower production. Her argument presumes that relative sales production is the critical factor. The court concludes that there remains a genuine issue of material fact as to the second prong of her prima facie case.

Mrs. Torre also argues that defendants failed to recognize her as a "Big Hitter" at the 1991 company-wide "kick-off" meeting. It is undisputed that she was designated a "Big Hitter," Federated recognizes recipients of the "Big Hitter" Award at its annual company-wide "kick-off" meeting, and Mrs. Torre received the Award, but was not publicly recognized at the meeting. Defendants nowhere dispute that she was treated differently than similarly situated males. The court finds that she can prove her prima facie case. Defendants explanation for the disparate treatment is that Mr. Haegele, Mrs. Torre's Regional Marketing Manager, chose not to present the award publicly so as not to draw attention to the fact that only one of the Marketing Representatives under his supervision qualified for the Award. Mrs. Torre argues that defendants' explanation is unworthy of credence and, therefore, they fail to meet their step two burden. Defendants can meet their intermediate burden, and thereby rebut the prima facie case, by merely explaining their actions in terms that are not prohibited by Title VII. *See Flasher*, 986 F.2d at 1317. It is only unexplained actions, not unexplained disparities, that will justify summary judgment for Mrs. Torre at step two. *See Id.* at 1318. Defendants produce evidence sufficient to meet their intermediate burden. *Cf. Id.* at 1316 n. 4 (noting that the employer need only pro-

---

**13.** In an affidavit, she provides a list of "averages" for five Marketing Representatives, including herself. She supports the list with only a vague reference to items produced by defendants during discovery. There is no basis in the record for the figures in her list. Nor is there any mention of how she calculated the averages. Specifically, she does not discuss whether she based her "averages" on quotes given to similarly situated male Marketing Representatives (those selling insurance to comparable business-es with comparable levels of risk). The list does not raise a genuine issue as to her claim.

**14.** The announcement of Mr. Richardson's receipt of the Award for April 1991 states as follows: "Recipients of this award are recognized for their outstanding total job performance. This includes service to clients as well as outstanding sales achievements."

duce evidence of a "facially nondiscriminatory" reason). Since defendants have rebutted Mrs. Torre's prima facie case, she now is left with her ultimate burden of proving intentional sex discrimination. Mrs. Torre attacks Mr. Haegele's explanation as incredible. That is, she argues that defendants' proffered reason is merely a pretext for unlawful discrimination. Whether Mr. Haegele's explanation is pretextual requires some examination of his credibility. The court declines to grant summary judgment based upon a determination of Mr. Haegele's credibility. Accordingly, the court finds that there remains a genuine issue of material fact as to whether defendants engaged in intentional sex discrimination.

### 2. Disparate Impact

■ Unlike a disparate treatment claim, a disparate impact claim does not require a finding of intentional discrimination. *Ortega,* 943 F.2d at 1242. Instead, the focus is on whether an identified employment practice "has a substantial adverse impact on a group protected by Title VII." *Drake,* 927 F.2d at 1161 (quoting *Lowe v. City of Monrovia,* 775 F.2d 998, 1004 (9th Cir.1985), *modified,* 784 F.2d 1407 (9th Cir.1986)) (internal quotes omitted). The disparate impact theory recognizes that "some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank & Trust,* 487

U.S. 977, 987, 108 S.Ct. at 2777, 2785, 101 L.Ed.2d 827 (1988).

■ Like the disparate treatment analysis, the disparate impact analysis involves a three-part inquiry. *Ortega,* 943 F.2d at 1242–44. Plaintiff first must establish a prima facie case of disparate impact based on sex. *Id.* at 1242–43. Once the prima facie case is shown, defendants must demonstrate a business justification for the challenged employment practice.[15] *Id.* at 1243. If defendants satisfy their step two obligation, plaintiff still may prevail by showing defendants failed to adopt a readily available, nondiscriminatory alternative to the challenged practice. *Id.* at 1244.

■ To establish her prima facie case, Mrs. Torre "must show that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group." *See Id.* at 1242 (citing *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989)).[16] Defendants argue that Mrs. Torre fails to produce evidence sufficient to establish her prima facie case. The court agrees.

■ Although it is unclear, Mrs. Torre seems to argue that defendants' mechanisms for promotion or transfer are subjective and have a disparate impact on female Marketing Representatives. Disparate impact analysis is applicable to subjective or discretionary employment practices. *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 991, 108

---

**15.** Mrs. Torre filed this action on October 2, 1991. The effective date of the Civil Rights Act of 1991 ("the 1991 Act") is November 21, 1991. In *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court held that certain provisions of the 1991 Act are not to be applied retroactively. Specifically, the court discussed only § 102. The Court's holding is limited to the retroactivity of these provisions. *See Landgraf,* —— U.S. at —— – ——, —— – ——, and —— – ——, 114 S.Ct. at 1487–88, 1488–89, and 1507–10.

Section 105 of the 1991 Act altered the three-step analysis. The parties do not discuss the effect of the 1991 Act on the three-step analysis. In § 105, Congress overruled the *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), distribution of the burdens. Under *Wards Cove,* the employer's step two burden is only one of production. *Wards*

*Cove,* 490 U.S. at 659, 109 S.Ct. at 2126. The 1991 Act changes the step two burden to one of persuasion. 42 U.S.C. § 2000e–2(k)(1)(A)(i). Accordingly, under the 1991 Act, once plaintiff makes a prima facie showing, the employer must persuade the trier of fact that its challenged practices are justified by business necessity.

The instant case turns on Mrs. Torre's inability to make a prima facie showing. The outcome of the instant case is the same regardless of whether 42 U.S.C. § 2000e–2(k)(1)(A)(i) applies here. Thus, the court finds it unnecessary to determine whether defendants' step two burden is one of production or persuasion.

**16.** Although the 1991 act appears to leave intact the prima facie case discussed in *Wards Cove,* *E.E.O.C. v. Joint Apprenticeship Committee,* 828 F.Supp. 264, 265 (S.D.N.Y.1993), one apparent alteration can be found at 42 U.S.C. § 2000e–2(k)(B)(i).

S.Ct. 2777, 2787, 101 L.Ed.2d 827 (1988). Under the disparate impact theory, Mrs. Torre can establish a prima facie case by showing that a particular practice operates to select persons for promotion in a gender pattern significantly different from that of the pool of applicants. *See Kachel,* 743 F.Supp. at 756. *See also Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975) (noting that plaintiff must show that "the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants").

Mrs. Torre's burden in establishing her prima facie case requires more than a mere showing that there are statistical disparities in Federated's workforce. *See Wards Cove,* 490 U.S. at 656, 109 S.Ct. at 2124; *Watson,* 487 U.S. at 994, 108 S.Ct. at 2788–89 (plurality opinion). As the plaintiff, she is responsible for, and must begin by, isolating and identifying the specific employment practice that she alleges is responsible for any statistical disparities. *Id.* Mrs. Torre appears to challenge Federated's practice regarding promotion or transfer *in toto.* She alleges a menu of acts ranging from general sexual bias [17] to career assessments, all of which she challenges. After examining the record, and her memoranda, the court understands Mrs. Torre's disparate impact claim to be a general challenge to the way Federated promotes and transfers Marketing Representatives. The court is uncertain that such a shotgun challenge satisfies *Watson*'s requirement that a plaintiff isolate and identify a specific employment practice. However, for the purposes of this motion, the court assumes that her general challenge satisfies the specificity requirement of *Watson.*[18]

To complete her prima facie showing, Mrs. Torre must demonstrate (1) a disparate impact and (2) causation. A plaintiff may rely on statistics to show that a challenged practice has a disparate impact. *Wards Cove,* 490 U.S. at 650, 109 S.Ct. at 2121; *Ortega,* 943 F.2d at 1243. Mrs. Torre has presented various forms of "statistical" evidence. However, her evidence is characterized by a lack of completeness and is of questionable reliability.[19] Her claim regards discrimination in promotions but she makes no attempt to define the relevant applicant pool. Furthermore, the information she does provide contains no indication whether the individuals mentioned possess the minimal qualifications for promotion.

A plaintiff must present statistics which are relevant to her specific claim.[20] It is not sufficient for Mrs. Torre to point to just any statistical disparity. Statistics are useful because they enable the parties to make comparisons. The proper comparison is between the gender composition of the "at-issue" jobs and the gender composition of the qualified persons in the applicant pool. *See Wards Cove,* 490 U.S. at 650–651, 109 S.Ct. at 2121; *Ortega,* 943 F.2d at 1244. Mrs. Torre's statistics do not enable a fact-finder

---

**17.** She alleges a litany of acts which show an atmosphere of sexual bias, such as: (1) failing to contract with a manufacturer capable of providing blazers for males and females; (2) using football references at training sessions; (3) showing a film to trainees containing scenes of a man defecating; and (4) providing different accommodations for female trainees. She also contends that, during training, males went to "strip bars" after the training sessions had ended. She contends that these acts, among others, reflect that Federated fostered an atmosphere of "masculine stereotypical personality traits."

**18.** The 1991 Act states that a disparate impact plaintiff "shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decision-making process may be analyzed as one employment practice." 42 U.S.C. § 2000e–2(k)(B)(i).

Mrs. Torre makes very broad allegations. She nowhere specifically demonstrates that the elements of Federated's decisionmaking process are not capable of separation for analysis. However, out of an abundance of caution, the court analyzes the promotion process *in toto.*

**19.** For example, Mrs. Torre cites to her own deposition testimony to support her allegations about the relative number of female Marketing Representatives and supervisory employees and her figures regarding the relative number of these female employees are incomplete.

**20.** More specifically, a plaintiff must present relevant statistics which demonstrate disparities so substantial that they raise an inference of causation. *Watson,* 487 U.S. at 995, 108 S.Ct. at 2789.

to make the proper comparison. She does not present a complete picture of the gender composition of the "at-issue" jobs, jobs to which Marketing Representatives are promoted, and she presents nothing related to the gender composition of the qualified persons in the applicant pool.

Even if the court assumes that Mrs. Torre presents statistics capable of showing disparate impact, she fails to show causation. To prove causation, she "must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for ... promotions because of their membership in a protected group." *Watson*, 487 U.S. at 994, 108 S.Ct. at 2789 (plurality opinion). *See also Wards Cove*, 490 U.S. at 656–57, 109 S.Ct. at 2124–25.

Although incomplete, Mrs. Torre presents some evidence of the gender composition of the "at-issue" jobs. What she presents demonstrates a gender disparity. However, this disparity alone does not prove the causation element of her prima facie case. *See Wards Cove*, 490 U.S. at 657, 109 S.Ct. at 2125 (stating that a showing that nonwhites are underrepresented in the "at-issue" jobs, without more, is insufficient to make out a prima facie case of disparate impact). Mrs. Torre has to demonstrate that the disparity she complains of is the result of one or more of the employment practices she is attacking here, specifically showing that each challenged practice has a significantly disparate impact on employment opportunities for males and females.[21] *See Id.* She does not demonstrate that specific elements of Federated's promotion process have a significantly disparate impact on females.

In conclusion, the court finds that Mrs. Torre has not made a prima facie case be-

cause she has not identified a specific promotional practice, shown disparate impact through a proper statistical comparison, or demonstrated causation between the general practice she challenges and the "bottom-line" disparate impact she alleges. Therefore, the court grants defendants motion as to Mrs. Torre's disparate impact claim.

### 3. Retaliation

■ Mrs. Torre also claims defendants retaliated against her for complaining about sex discrimination and filing complaints with the Equal Employment Opportunity Commission ("EEOC") and the Kansas Human Rights Commission ("KHRC"). In plaintiffs' memorandum in support of their motion for summary judgment, Mrs. Torre argues that the court should grant her summary judgment on her retaliation claim.[22] Defendants' motion for summary judgment omits any mention of her retaliation claim.[23] Accordingly, the court views this claim as being the subject of only Mrs. Torre's motion for summary judgment.

The court examines her retaliation claim with respect to the following five challenged acts: (1) failing to promote or transfer her; (2) forcing her to open a Topeka office; (3) providing her with unreasonable price quotes; (4) failing to give her the Leadership Council Award in 1991; and (5) failing to publicly recognize her receipt of the "Big Hitter" Award at the 1991 "kick-off" meeting.

■ It is unlawful for an employer to retaliate against an employee who has engaged in Title VII protected activity. 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, Mrs. Torre must

---

21. As the Court explained in *Wards Cove*, "[t]o hold otherwise would result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces.'" *Id.* (quoting *Watson*, 487 U.S. at 992, 108 S.Ct. at 2787).

22. After listing a series of challenged actions, including those previously examined as part of her disparate treatment argument, the pretrial order contains the following: "[t]he above actions, inactions, and denials were also in part in

retaliation for Pamela Torre's complaints regarding one or more of said actions, inactions, and/or denials." Pretrial Order (Doc. 220), filed April 15, 1994, at p. 4.

23. Although the underlying facts are the same, defendants' summary judgment motion analyzes only § 2000e–2(a) sex discrimination under the disparate treatment and impact theories. Defendants' motion provides no mention or analysis of § 2000e–3(a) retaliation.

prove the following: (1) she engaged in protected opposition to discrimination or participated in a proceeding arising out of discrimination; (2) adverse action by her employer subsequent to the protected activity; and (3) a causal connection between such activity and the employer's action. *See Archuleta v. Colorado Dept. of Institutions,* 936 F.2d 483, 486 (10th Cir.1991); *Allen v. Denver Public School Board,* 928 F.2d 978, 985 (10th Cir. 1991); *Anderson v. Phillips Petroleum Co.,* 861 F.2d 631, 634 (10th Cir.1988). If she establishes her prima facie case, the burden of production shifts to defendants who must articulate a legitimate, nondiscriminatory reason for the adverse action. *Anderson,* 861 F.2d at 634. If defendants establish a legitimate reason, she still may prevail if she demonstrates the articulated reason was a mere pretext for discrimination. *Id.*

Mrs. Torre first must show that she engaged in protected opposition to discrimination. Her memoranda fails to discuss this element. The court has reviewed the voluminous factual submissions in search of instances of protected opposition. The submissions reveal instances where she expressed various concerns to her superiors (e.g., to superiors at a training session about occurrences at the session; to Mr. Haegele at the March 1991 in Kansas City; to Mr. Haegele after failing to receive recognition as a "Big Hitter" at the "kick-off" meeting). It is unclear whether the instances mentioned in her submissions constitute the requisite opposition because the court is uncertain as to the substance of the communications. Mrs. Torre also claims to have filed complaints with the EEOC and KHRC on May 23, 1991. However, she does not provide the complaints. In fact, her only reference to these complaints is at Fact # 137 in the form of an unsupported aside. Plaintiff's Memorandum in Support, filed July 7, 1993 (Doc. 191), at p. 15. The court can find no evidence definitively establishing a date on which she engaged in protected opposition to discrimination. She challenges five acts as retaliatory but does not produce evidence about prior protected activity. An act cannot be retaliatory unless preceded by protected opposition to discrimination. She fails to prove the first, second, and third

prongs of her prima facie case. Her motion is denied as to retaliation.

## B. *ERISA*

Plaintiffs make two claims under ERISA: (1) a 29 U.S.C. § 1132(a)(1)(B) claim to recover health benefits due under the terms of Plan # 501 ("benefits claim"); and (2) a 29 U.S.C. § 1140 claim for unlawful discrimination as a result of Mrs. Torre's exercise of ERISA rights and for the purpose of interfering with the attainment of rights to which she was entitled under Plan # 501 ("discrimination claim"). The court will address each claim separately.

### 1. The Benefits Claim

The first ERISA claim is for benefits due under Plan # 501. Plaintiffs bring their benefits claim pursuant to 29 U.S.C. § 1132(a)(1)(B) which provides that "[a] civil action may be brought by a plan participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Plaintiffs' benefits claim requires the court to determine whether Federated permissibly denied plaintiffs' requests for coverage. The first step in this determination is finding the proper standard under which to review Federated's actions.

Although § 1132(a)(1)(B) provides for the review of a denial of benefits allegedly due under a welfare benefit plan, it does not set out the appropriate standard of review. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 109 S.Ct. 948, 953–54, 103 L.Ed.2d 80 (1989). In *Firestone Tire & Rubber Co. v. Bruch,* the Supreme Court looked to principles of trust law to determine the appropriate standard. *Id.* at 111, 109 S.Ct. at 954–55. After a general review of trust law, the Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109

S.Ct. at 956–57. If the plan gives discretionary authority, review is under the arbitrary and capricious standard. *Winchester v. Prudential Life Ins. Co. of America*, 975 F.2d 1479, 1483 (10th Cir.1992); *Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452, 1457 (10th Cir.1991). *See also Sandoval v. Aetna Life and Cas. Co.*, 967 F.2d 377, 380 (10th Cir.1992) (citing *Bruch* for the proposition that "in action brought under § 1132(a)(1)(B), discretionary actions of fiduciary reviewed under arbitrary and capricious standard").

Plaintiffs argue that Federated has a conflict of interest and, therefore, the court must apply *de novo* review. The court does not read *Bruch* as supporting plaintiffs' argument. According to *Bruch*, the court's first inquiry is whether the plan documents provide the administrator with discretion. If the documents provide no discretion, the inquiry is over and the standard is *de novo. Bruch*, 489 U.S. at 115, 109 S.Ct. at 956–57. On the other hand, if the documents provide discretion, review is by the arbitrary and capricious standard. A conflict of interest is relevant only if the documents provide discretion. *See Id.* (noting that *de novo* standard applies regardless of whether the administrator has a conflict). Where there is both discretion and a conflict of interest, *Bruch* instructs that "the conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion." *Id.* (internal quotations omitted).

Accordingly, the first question is whether Federated, as the designated Administrator of Plan # 501, had the requisite discretionary authority. *Bass v. Prudential Ins. Co. of America*, 764 F.Supp. 1436, 1439 (D.Kan. 1991). A court must examine the plan documents to ascertain whether an administrator has discretionary authority. The documents must give an administrator discretionary authority "in specific words." *Id.* However, *Bruch* does not require that the documents contain any "magic words." *Block v. Pitney Bowes Inc.*, 952 F.2d 1450, 1453 (D.C.Cir. 1992); *De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1187 (4th Cir.1989); *Gust v. Coleman Co., Inc.*, 740 F.Supp. 1544, 1550 (D.Kan. 1990), *aff'd*, 936 F.2d 583 (10th Cir.1991).

That is, plan documents may impart discretionary authority without specifically referring to either "discretion" or "discretionary authority." *Block*, 952 F.2d at 1453; *De Nobel*, 885 F.2d at 1187; *Gust*, 740 F.Supp. at 1550. The documents need give only the power to construe disputed terms or to resolve disputes over eligibility for benefits.

Defendants have directed the court to language in Plan # 501 that grants the Administrator power to determine eligibility for benefits. Plan # 501 provides that "[e]xpenses are considered Covered Expenses to the extent that the services or supplies provided are essential for the Necessary Care and Treatment of an Injury or Sickness." Defendants' Appendix of Exhibits, Ex. 23, p. 16. The definition of "Necessary Care and Treatment of an Injury or Sickness" provides that "[i]n the case of Hospital or Convalescent Nursing Facility Confinement, the length of confinement and the services and the supplies furnished by the Hospital or Convalescent Nursing Facility will be 'necessary' only if it is determined by Us that they are related to the care or treatment of the Injury or Sickness." *Id.* at p. 7. Plan # 501 gives the Administrator the right to determine what length of confinement as well as which services and supplies are necessary. That is, it gives the Administrator the right to determine what length of confinement and which services and supplies are payable. Thus, the Administrator has the discretion to determine eligibility for benefits under the plan. Such discretion satisfies *Bruch. See Anderson v. Blue Cross/Blue Shield of Alabama*, 907 F.2d 1072, 1076 (11th Cir.1990) (holding that an administrator had the requisite discretionary authority where the plan documents gave the administrator the right to determine which services and supplies are medically necessary and to determine the amount to be paid); *Mann v. Prudential Ins. Co. of America*, 790 F.Supp. 1145, 1150 (S.D.Fla.1992) (noting sufficient discretion where plan required the administrator to make the initial benefit decision and assess whether services and supplies are necessary).

Since the documents confer the requisite discretion, Federated argues that the court must apply the arbitrary and capricious

standard. Under this standard, an interpretation ordinarily will be upheld if it is reasonable and made in good faith. *Rademacher v. Colo. Ass'n of Soil Cons. Med. Plan,* 11 F.3d 1567, 1569 (10th Cir.1993). However, where the administrator is operating under a conflict of interest, the standard is less deferential. *Pitman v. Blue Cross and Blue Shield,* 24 F.3d 118, 122–24 (10th Cir.1994); *Brown v. Blue Cross & Blue Shield of Alabama,* 898 F.2d 1556, 1566–67 (11th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991); *Bass,* 764 F.Supp. at 1440 (following *Brown* ). *See also Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80, 87 (4th Cir.1993).

In *Bass v. Prudential Ins. Co. of America,* former Chief Judge O'Connor discussed the standard to be applied when there is a conflict of interest. In *Bass,* Prudential issued an insurance plan covering J.C. Penney's employees. The plan provided Prudential with the discretion to interpret its terms. Prudential denied an employee's claim under the plan. The employee sued under § 1132(a)(1)(B).

Chief Judge O'Connor first examined whether Prudential had a conflict of interest when it denied plaintiff's claim. He explained that "[w]hen an insurance company serves as an ERISA fiduciary to a plan composed of a policy issued by that company, it 'is exercising discretion over a situation for which it incurs 'direct, immediate expense as a result of benefit determinations favorable to the [p]lan participants.'" *Bass,* 764 F.Supp. at 1440 (quoting *Brown,* 898 F.2d at 1561–62 (quoting *De Nobel v. Vitro Corp.,* 885 F.2d 1180, 1191 (4th Cir.1989))). He concluded that " 'a strong conflict of interests [exists] when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims.'" *Id.* (quoting *Anderson v. Blue Cross & Blue Shield of Alabama,* 907 F.2d 1072, 1076 (11th Cir.1990)).

After holding that Prudential's dual status created a "strong conflict of interests," Chief Judge O'Connor discussed the appropriate standard of review. He began by noting that the inherent conflict between Prudential's role as fiduciary and its profit-making objective as insurance company made inappropriate the simple arbitrary and capricious standard. Instead, he chose to apply the test adopted by the Eleventh circuit in *Brown v. Blue Cross & Blue Shield of Alabama.* The *Brown* test is as follows:

> when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest. That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries.

*Brown,* 898 F.2d at 1566–67.

Federated is designated as the ERISA Administrator of Plan # 501. Federated also issued the policy designated as Plan # 501. In the instant case, as in *Bass,* the court is faced with a situation where the ERISA fiduciary is also the insurance company which issued the policy constituting the plan. In *Bass,* Judge O'Connor noted that "[s]ince, 'an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business.'" *Id.* at 1561. *See also Pitman,* 24 F.3d at 122 (quoting *Brown* ); *Miller v. Metropolitan Life Ins. Co.,* 925 F.2d 979, 984 (6th Cir.1991) (citing to *Brown* and noting that the dual relationship of fiduciary and insurer creates a substantial conflict of interest). The Eleventh Circuit elaborated on the inherent conflict when, in *Brown,* it wrote as follows:

> Decisions made by the issuing company on behalf of a plan based on a contract of insurance ... inherently implicate the hobgoblin of self-interest. Adverse benefits determinations save considerable sums that are returned to the fiduciary's corporate coffers. The presumption that the fiduciary is acting for the future stability of the fund cannot be entertained.

*Brown*, 898 F.2d at 1568. The court finds *Brown* and *Bass* persuasive and applicable to the instant case.[24] Accordingly, the court finds that Federated's dual role as Plan #501's Administrator and issuing insurance company creates a strong conflict of interest. *See Cargile v. Confederation Life Ins. Group Plans*, 748 F.Supp. 874, 877–78 (N.D.Ga. 1990) (applying *Brown* test to situation where plaintiff was employee of an insurance company that administered a plan composed of a policy it issued). The court is further persuaded that the inherent conflict between Federated's fiduciary role as Administrator and its profit-making objective as insurance company makes inappropriate a highly deferential standard of review. *See Id.* (same). Therefore, the court holds that the *Brown* test is the applicable standard of review.

Federated argues that even if the court decides to apply a heightened standard of review to its decisions as Administrator, the court should distinguish between plan interpretation and factual determinations. In support, Federated cites to several cases in which courts have limited *Bruch* to actions involving plan interpretation. *See, e.g., Cox v. Mid–America Dairymen, Inc.*, 965 F.2d 569, 571 n. 2 (8th Cir.1992); *Pierre v. Connecticut General Life Ins. Co.*, 932 F.2d 1552 (5th Cir.), *cert. denied*, ___ U.S. ___, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991); *Kunsten-*

*aar v. Connecticut Gen. Life Ins. Co.*, 902 F.2d 181, 183 (2d Cir.1990).

In *Pierre v. Connecticut General Life Ins. Co.*, the decision on which Federated chiefly relies, the Fifth Circuit engaged in an exhaustive analysis of *Bruch*. The Fifth Circuit explained that before benefits are paid or denied, an administrator makes a series of decisions that fall into one of two categories. According to this view, when making benefits decisions, an administrator is either determining (1) the facts underlying the claim or (2) whether these facts constitute a payable claim under the terms of the plan. *Id.* at 1557. The Fifth Circuit concluded that the holding of *Bruch* is specifically limited to plan interpretation. That is, it concluded that *de novo* review applies only to determinations that fall into the second category.[25] The Fifth Circuit further held that factual determinations, those that fall into the first category, are to be reviewed under the abuse of discretion standard. *Id.* at 1562.

Although the parties have cited no relevant Tenth Circuit authority, at least one judge within the District of Kansas has followed *Pierre*. *See Christie v. K–Mart Corp. Emp. Ret. Pension Plan*, 784 F.Supp. 796, 801 (D.Kan.1992) (Judge Crow). It is unclear whether the Supreme Court or the Tenth Circuit would give deference to an adminis-

**24.** Federated argues there is no conflict of interest. In support, it relies solely on *Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452 (10th Cir.1991). In *Woolsey*, an administrator served dual roles as company employee and plan fiduciary. The Tenth Circuit held that this relationship alone does not establish that the administrator acted arbitrarily and capriciously. *Id.* at 1459.

Unlike *Woolsey*, the instant case involves a situation where an insurance company occupied the dual roles of policy issuer and ERISA fiduciary of a plan consisting of that policy. *Woolsey* does not address the conflict inherent in a situation where an insurance company both issued the policy and is charged with the responsibility to administer an ERISA plan consisting of that policy. The court is persuaded that *Woolsey* is factually distinguishable from the instant case. *Cf. Cargile v. Confederation Life Ins. Group Plans*, 748 F.Supp. 874, 878 (N.D.Ga.1990) (facing a situation where the defendant was an insurance company that employed plaintiff, issued the policy in question, and acted as ERISA administrator of the plan consisting of the policy, the court

distinguished from *Brown* several cases holding that an employer may use its own employees as ERISA administrators).

**25.** The Fifth Circuit's conclusion is motivated primarily by the following language from *Bruch:* "[t]he discussion that follows is *limited* to the appropriate standard of review in § 1132(a)(1)(B) actions challenging denials of benefits based on *plan term interpretations.*" *Bruch*, 489 U.S. at 108, 109 S.Ct. at 953 (emphasis added).

Among other supporting rationale, the Fifth Circuit provided the following "compelling practical reason":

The courts simply cannot supplant plan administrators, through *de novo* review, as resolvers of mundane and routine fact disputes. [Citation omitted]. Considerations of expediency therefore support deference to factual determinations made in the administration of the plan. Otherwise, federal trials are encouraged in the vast numbers of claims that are filed in the thousands of ERISA plans throughout this country.

trator's factual determinations.[26] However, the court is persuaded that even if *Pierre* applies, Federated's conflict of interest offsets the deference owed to its factual determinations.[27] *Cf. Leahy v. The Bon, Inc.*, 801 F.Supp. 529, 537–39 (D.Utah 1992). A conflict of interest makes an administrator's factual determinations suspect for the same reasons its plan interpretations are suspect. Since Federated operated under a conflict of interest, the court applies the same standard to Federated's factual determinations that it applies to Federated's plan interpretations. Thus, the court applies the *Brown* test without regard to the distinction drawn in *Pierre*.[28] Any other holding would allow an administrator to advance its own interests at the expense of the employee beneficiary.

█ The *Brown* test involves a two part inquiry. *Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1550 (11th Cir.1994); *Brown*, 898 F.2d at 1570; *Cargile v. Confederation Life Ins. Group Plans*, 748 F.Supp. 874, 878–79; *Presley v. Blue Cross/Blue Shield of Alabama*, 744 F.Supp. 1051, 1056 (N.D.Ala.1990). First, the court must determine whether the administrator's interpretation was legally correct. Specifically, the court must determine whether the participant or beneficiary has proposed a sound interpretation of the plan. *Id.* Second, the court examines whether the administrator was otherwise arbitrary and capricious in adopting a different interpretation. *Id.*

The court finds guidance in the Eleventh Circuit's summary of the rationale supporting its two-step inquiry:

> a fiduciary operating under a conflict of interest may be entitled to review by the arbitrary and capricious standard for its discretionary decisions as provided in the ERISA plan documents, but the degree of deference actually exercised in application of the standard will be significantly diminished. A court should not exercise de novo review, but the area of discretion to which deference is paid must be confined narrowly to decisions for which a conflicted fiduciary can demonstrate that it is operating exclusively in the interests of the plan participants and beneficiaries. Even a conflicted fiduciary should receive deference when it demonstrates that it is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries. The fiduciary, however, should bear the burden of dispelling the notion that its conflict of interest has tainted its judgment. If the fiduciary carries this burden, the party challenging its action may still succeed if the action is arbitrary and capricious by other measures.

*Brown*, 898 F.2d at 1568.

### a. Application of Brown: First Step

At the first step of the heightened arbitrary and capricious standard, the court must determine whether Federated's interpreta-

---

**26.** The court notes that there is a split among the circuits as to whether *Bruch*'s de novo standard applies to both factual determinations and plan interpretations.

The following circuits have held that the de novo standard applies only to plan interpretations: *Cox v. Mid–America Dairymen*, 965 F.2d 569, 571 n. 2 (8th Cir.1992) (citing to *Oldenburger v. Central States S.E. & S.W. Areas Teamster Pen. Fund*, 934 F.2d 171, 173 (8th Cir.1991)); *Pierre v. Connecticut General Life Ins. Co.*, 932 F.2d 1552 (5th Cir.1991).

The following circuits have held that the de novo standard applies to both factual determinations and plan interpretations: *Luby v. Teamsters Health, Welfare, & Pen. Tr. Funds*, 944 F.2d 1176, 1183 (3d Cir.1991); *Reinking v. Philadelphia American Life Ins. Co.*, 910 F.2d 1210, 1213–14 (4th Cir.1990); *Petrilli v. Drechsel*, 910 F.2d 1441, 1444–45 (7th Cir.1990).

**27.** Without adopting *Pierre*, the court finds that a heightened standard applies to both factual determinations and plan interpretation. That is, the court finds that regardless of whether factual determinations are distinct from plan interpretations for the purposes of *Bruch*, the conflict here requires that a heightened standard apply. Thus, for the purposes of this motion, it is unnecessary for the court to decide whether to adopt the Fifth Circuit's holding in *Pierre*.

**28.** The *Brown* test is applicable to factual determinations as well as plan interpretations. *See, e.g., Newell v. Prudential Ins. Co.*, 904 F.2d 644, 652 (11th Cir.1990) (applying *Brown* outside the context of plan interpretation); *Cargile v. Confederation Life Ins. Group Plans*, 748 F.Supp. 874, 878 n. 2 (N.D.Ga.1990) (noting *Brown*'s applicability to factual determinations as well as plan interpretations).

tion was legally correct. *See Lee,* 10 F.3d at 1550; *Brown,* 898 F.2d at 1570; *Cargile,* 748 F.Supp. at 878–79; *Presley,* 744 F.Supp. at 1056. More specifically, the court must determine whether plaintiffs have proposed a sound interpretation, one that can rival Federated's. *See Id.*

When applying *Brown* to determine whether plaintiffs' have proposed a sound interpretation, the court is to look only to facts known to Federated at the time it made the relevant decision. *See Lee v. Blue Cross/ Blue Shield of Alabama,* 10 F.3d 1547, 1550 (11th Cir.1994) (applying *Brown* and analyzing whether plaintiff had proposed a sound interpretation based on only the facts known to the administrator at the time it made its decision). *Cf. Motley v. Metropolitan Life Ins. Co.,* 834 F.Supp. 1272, 1277 (D.Kan. 1993).

Plaintiffs' benefits claim presents three questions. First, did Federated properly classify Trisha's condition as "mental illness"? Second, did Federated properly classify expenses Trisha incurred at the Davison School as educational rather than medical? Third, was Federated obligated to assist plaintiffs in placing Trisha in a covered residential treatment facility?

Plaintiffs first argue that Federated incorrectly allocated expenses from Laurel Ridge Hospital to Plan # 501's $50,000 mental/nervous limit. They argue that Federated's misallocation caused Laurel Ridge to discharge Trisha prematurely. As a result, Trisha transferred to the Davison School. Plaintiffs do not specifically argue that Plan # 501's definition of "mental illness" is ambiguous.

Plan # 501 has two lifetime benefits limits: (1) a $1,000,000 limit on medical expenses; and (2) a $50,000 limit on mental/nervous expenses. Expenses that are attributed to medical treatment reduce the available medical limit and expenses that are attributed to the treatment of a mental illness reduce the

available mental/nervous limit. Plan # 501 defines "mental illness" to mean "any mental disorder or functional nervous disorder and includes psychiatric or psychological treatment of any physical condition." Plaintiffs' argument is that Federated incorrectly classified Trisha's treatment at Laurel Ridge as being for a "mental illness" and thereby caused her to exhaust the $50,000 mental/nervous limit and resulted in her premature withdrawal from Laurel Ridge. Federated argues that the nature of the treatment is dispositive. Specifically, Federated argues that it made a reasonable decision to classify her treatment as "mental illness" based on the information it had before it.

The following facts are clear: Trisha was admitted to Laurel Ridge on January 3, 1990; Federated retained TMF to assist in its classification of Trisha's treatment and determination of medical necessity (that is, to assist in deciding whether and under what limit her expenses would be paid); TMF assigned a psychiatrist, Dr. Jordan, to review her case; on January 29, 1990, Federated allocated expenses she incurred at Laurel Ridge to her $1,000,000 medical limit; Dr. Jordan subsequently advised Federated Trisha was receiving psychological/psychiatric treatment; Federated then began allocating expenses to her $50,000 mental/nervous limit; Mrs. Torre and Laurel Ridge objected; on April 22, 1990, Trisha was discharged from Laurel Ridge; in July of 1990, at the suggestion of the Kansas Insurance Commissioner, Federated sent her case to a pediatric neurologist for review; the pediatric neurologist reported that Trisha suffered from a neurological disease and Laurel Ridge had provided appropriate care; [29] and following receipt of the pediatric neurologist's report, Federated reallocated expenses incurred at Laurel Ridge to the $1,000,000 medical limit.

Mrs. Torre places great emphasis on the fact that Trisha's condition is "organic" and physical in nature. However, Plan # 501 defines "mental illness" to include "psychiat-

---

**29.** Specifically, his report states as follows: "I believe her stay and treatment were due to neurological disease and were justified. Treatment may have been unduly hastened and truncated due to financial considerations. However, Dr. Jerry Tomasovic (a child Neurologist, not a Psy-

chiatrist) provided appropriate care by medical means, drugs, and treatments (speech therapy, behavioral modification techniques), for her neurological condition." TMF Report to Federated, July 27, 1990, at p. 2.

ric or psychological treatment of any physical condition." Thus, the "organic" nature of Trisha's condition is not dispositive. The question for the court at step one is as follows: have plaintiffs proposed a sound interpretation, one to rival Federated's, given that the "organic" nature of Trisha's condition is not dispositive of whether the treatment she received for that condition properly falls under Plan # 501's definition of "mental illness"? After examining the extensive record, and considering the parties' memoranda, the court finds that it is unclear whether plaintiffs can carry their step one burden. Federated argues that its initial decision was sound because, based on the information it had at the time, the treatment Trisha received was psychiatric and psychological. Plaintiffs argue that Federated's decision was incorrect because Trisha's condition was physical and her treatment was medical. However, there is simply insufficient evidence in the record as to the nature of the treatment to support either parties' motion.

The record indicates that Federated hired TMF to aid in its benefits determination. Federated appears to have requested TMF assign a psychiatrist to Trisha's case. TMF assigned Dr. Jordan. Dr. Jordan concluded that the treatment was psychiatric/psychological. Federated based its benefits determination on Dr. Jordan's conclusion and the codes on Trisha's bills. Dr. Jordan formed his opinion after conversations he had with Dr. Tomasovic, a pediatric neurologist at Laurel Ridge. Dr. Jordan never reviewed the written treatment plan prepared by Dr. Tomasovic and his staff. It appears Dr. Jordan never reviewed Trisha's medical records. Dr. Jordan assumed Dr. Tomasovic was a psychiatrist in the psychiatric ward at

Laurel Ridge. In his deposition, Dr. Tomasovic raises some questions whether Dr. Jordan fully understood the course of treatment in Trisha's case. Federated did not have a pediatric neurologist review Trisha's case until after the relevant benefits decisions were made. Plaintiffs base their interpretation on Dr. Tomasovic's opinions. Dr. Tomasovic believes Trisha suffers from an "organic" condition akin to a stroke. It is not clear whether the treatment provided constitutes psychiatric or psychological treatment of her "organic" condition. That is, it is unclear whether plaintiffs' interpretation is consistent with the scope of Plan # 501's definition of "mental illness." Based on the information available when Federated made its decision, it is unclear whether the allocation of Trisha's expenses to her mental/nervous limit was wrong. The court finds there remains a genuine issue whether plaintiffs' alternative interpretation is sound.

▮▮▮▮ Plaintiffs' second argument relates to the payment of expenses Trisha incurred during her stay at the Davison School. Specifically, plaintiffs argue that Federated incorrectly classified her treatment as educational, rather than medical, which caused her withdrawal.[30] As with her first argument, Mrs. Torre nowhere specifically contends that the provisions at issue are ambiguous. Federated argues that its refusal to pay expenses was justified because Davison School is an educational facility and Plan # 501 does not cover educational costs.

Plan # 501 contains several sections discussing educational expenses. The section defining "NECESSARY CARE AND TREATMENT OF AN INJURY OR A SICKNESS" states that, in order to be con-

30. Plaintiffs also allude to the effect Rider three to Plan # 501 has on the expenses Trisha incurred during her stay at the Davison School. Rider three provides that "[t]he policy will provide coverage for the treatment of emotionally handicapped children in a licensed residential treatment facility, as defined by the State of Minnesota."

In their "benefits claim" analysis, plaintiffs do not develop a coherent argument based on Rider three. Particularly, they do not discuss how Rider three alters the essential question here: are the expenses incurred at the Davison School for medical or educational services?

As the court understands the context in which they refer to Rider three, it seems plaintiffs may be contending that Rider three somehow is an exception to Plan # 501's (1) medical-educational and (2) medical-mental/nervous distinctions. Further, it appears that plaintiffs even may be contending that Rider three is an exception to Plan # 501's policy limits.

Since this argument is undeveloped, the court is unable to consider it fully. The court anticipates this argument will receive attention if plaintiffs submit a trial brief.

sidered necessary (payable), the "care or treatment" or "services or supplies" provided "must not be for the scholastic education or vocational training of the patient." Plan # 501 again addresses "education" in the section listing "EXPENSES NOT COVERED." This section provides that "[c]overed expenses will not include, and no payment will be made for, expenses incurred: ... 14. for or in connection with Custodial Care, education or training." Federated argues that the expenses Trisha incurred at the Davison School are educational and, therefore, specifically excluded by Plan # 501's unambiguous language.

Step one requires plaintiffs to propose a sound interpretation, one that at least rivals Federated's. Federated argues that the services provided at the Davison School were educational. Plaintiffs argue that they were medical. After examining the record, and the parties' supporting memoranda, the court finds that it is unclear whether the expenses incurred at the Davison School are medical or educational. The parties have produced little evidence regarding the nature of the services provided to Trisha at the Davison School. Plaintiffs produce next to nothing in support of their claim. However, they produce just enough to avoid summary judgment.[31] Similarly, Federated produces little to support its interpretation. When read in the light most favorable to the nonmovant, the record is insufficient to support either of their motions. Thus, there remains a genuine issue as to whether the services Trisha received were educational.

■■■■ Plaintiffs' third argument is that Federated has failed to assist them place Trisha in a residential treatment facility. Federated argues that the terms of Plan # 501 do not require it to place Trisha in a residential treatment facility. They further argue that plaintiffs never point to a specific provision in Plan # 501 by which Federated is required to assist them place Trisha in a residential treatment facility.[32]

Plaintiffs make their benefits claim under § 1132(a)(1)(B). Section 1132(a)(1)(B) allows a participant or beneficiary to bring a civil action (1) to recover benefits due to her *under the terms of her plan,* (2) to enforce her rights *under the terms of her plan,* or (3) to clarify her rights to future benefits *under the terms of her plan.* An essential element of plaintiffs' "benefits claim" is some showing of an entitlement or right *under the terms of Plan # 501.* Federated argues that plaintiffs' "failure to assist" claim is not rooted in a benefit or right to which plaintiffs are entitled under the terms of Plan # 501. Reluctantly, the court disagrees.

Although plaintiffs do not cite to a specific provision, their vague references to Federated's "failure to assist" seem to allege a violation of the pre-certification procedures set out in Rider eleven. Specifically, their "failure to assist" argument may encompass a "failure to precertify" claim. After reviewing the record, and the parties' largely undeveloped arguments on this portion of plaintiffs' "benefits claim," the court finds that there is some question whether Trisha was diagnosed as an emotionally handicapped child within the meaning of Rider three and, if so, whether plaintiffs followed the procedures in Rider eleven such that Federated's obligation to make a precertification decision was triggered. To the extent plaintiffs argue that Federated has an affirmative duty to place Trisha in a residential treatment facility independent of Rider eleven, their argument is meritless. However, based on Rider eleven, and out of an abundance of caution, the court

---

**31.** For example, plaintiffs point to Dr. Tomasovic's deposition testimony in which he explained that he recommended the Davison School because it was capable of providing treatment pertinent to Trisha's needs. Other deposition testimony reflects that he considers the treatment she requires to be medical in nature.

**32.** Again, plaintiffs seem to rely on Rider three. Rider three states that Plan # 501 provides coverage for the treatment of emotionally handicapped children in licensed residential treatment facilities, as defined by Minnesota law. The terms of Rider three do not obligate Federated to provide an independent review for the purposes of diagnosing Trisha as an emotionally handicapped child. Nor do they obligate Federated actively to assist in the placement of an emotionally handicapped child. Instead, they merely require Federated to include expenses incurred at certain residential treatment facilities for the treatment of emotionally handicapped children as covered expenses under Plan # 501.

denies Federated's motion for summary judgment. The court also denies plaintiffs' motion for summary judgment because, when read in the light most favorable to Federated, the record does not demonstrate that Federated's "failure to assist" was wrong.

#### b. Application of Brown: Second Step

In the analysis of step one, the court found that there remain genuine issues of material fact that prevent the entry of summary judgment as to plaintiffs' three "benefits claim" arguments. At trial, if plaintiffs carry their step one burden, Federated then will have the burden of dispelling the notion that its conflict tainted its judgment. *Brown,* 898 F.2d at 1568. If Federated carries its initial burden, plaintiffs may still prevail if Federated's actions were "arbitrary and capricious by other measures." *Id.*

#### 2. The Discrimination Claim

Mrs. Torre alleges that defendants discriminated against her for exercising her rights under Plan # 501 and in an effort to interfere with her attainment of rights to which she was entitled under Plan # 501. Specifically, she claims a violation of 29 U.S.C. § 1140.

Section 1140 provides, in pertinent part, as follows:

> It shall be unlawful for any person to ... discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, ..., or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

Congress designed § 1140 to protect the employment relationship against actions designed to interfere with, or discriminate against, the attainment of a right under an employee benefit plan. *See Owens v. Storehouse, Inc.,* 984 F.2d 394, 398 (11th Cir.1993); *Deeming v. American Standard, Inc.,* 905 F.2d 1124, 1127 (7th Cir.1990). *See also West v. Butler,* 621 F.2d 240, 245 (6th Cir. 1980) (writing that "it appears Congress designed [§ 1140] primarily to protect the employment relationship that gives rise to an individual's pension rights"). "[A] fundamental prerequisite to a [§ 1140] action is an allegation that the employer-employee relationship, ..., was changed in some discriminatory or wrongful way." *Deeming,* 905 F.2d at 1127.

■■■ In order to recover under § 1140, Mrs. Torre must show that Federated had the specific intent to interfere with her Plan # 501 benefits. *Phelps v. Field Real Estate Co.,* 991 F.2d 645, 649 (10th Cir.1993). "[T]he essential element of proof under [§ 1140] is specific intent to engage in proscribed activity." *Gavalik v. Continental Can Co.,* 812 F.2d 834, 851 (3d Cir.1987), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987). Mrs. Torre may prove her case with either direct or indirect evidence. *Id.* at 852. Contrary to Mrs. Torre's assertions, she presents no direct evidence of specific intent. Therefore, she must rely on indirect evidence.

■■■ Since Mrs. Torre must rely on indirect evidence, the court applies the three-step burden shifting approach from *McDonnell Douglas* and *Burdine. Gavalik,* 812 F.2d at 852–53; *Babich v. Unisys Corp.,* 842 F.Supp. 1343, 1352 (D.Kan.1994). To establish her prima facie case, Mrs. Torre must demonstrate (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled. *Gavalik,* 812 F.2d at 852.

Generally, plaintiffs allege either discharge or constructive discharge as the prohibited employer conduct. However, discharge is not a prerequisite to an action under § 1140. *See, e.g., Gavalik,* 812 F.2d at 856; *Eret v. Continental Holding, Inc.,* 838 F.Supp. 358, 364 (N.D.Ill.1993); *Newton v. Otterloo,* 756 F.Supp. 1121, 1135–36 (N.D.Ind.1991); *Jess v. Pandick, Inc.,* 699 F.Supp. 698, 699 (N.D.Ill.1988). Mrs. Torre bases her claim not on a discharge but on a series of actions allegedly taken to harass her and interfere with her attainment of rights to which she was entitled under Plan # 501. The actions she challenges are as follows: (1) reducing her Territory Assignment from all of Shaw-

nee County to only the City of Topeka; (2) providing her with unreasonable price quotes; (3) forcing her to open a Topeka office; and (4) failing to promote her.

To avoid summary judgment, Mrs. Torre must present evidence of her employer's specific intent to violate ERISA. *Owens,* 984 F.2d at 399. That is, she must present evidence that her employer intentionally discriminated against her to retaliate for her exercise, or to interfere with her attainment, of rights under Plan # 501. *See Id.* Mrs. Torre does not present such evidence as to challenged actions (1) and (2). Therefore, as to her contentions regarding these two challenged actions, the court grants defendants' motion for summary judgment.

■ Challenged action (1), the "territory reduction," bears no reasonable relationship to her attainment of · benefits under Plan # 501. Mrs. Torre must present evidence from which a finder of fact reasonably could infer improper motive. ·She presents no evidence tending to establish that interference with, or discrimination for pursuing, Plan # 501 benefits, was a motivating factor for, rather than a possible consequence of, this challenged action. *Cf. Zimmerman v. Sloss Equipment Inc.,* 835 F.Supp. 1283, 1287 (D.Kan.1993) (explaining that "[u]nder section [1140], no cause of action lies where the loss of pension benefits is a mere consequence of, but not a motivating factor behind, a termination of employment"). There is no indication that the decision-makers who initiated this action were aware of Trisha's health claim. *Cf. Phelps,* 991 F.2d at 649 (reasoning that the question is whether the relevant decision-maker took the proscribed action because, at least in part, he wanted to protect the benefit plan from the plaintiff's health condition). Nor is there any indication that Trisha's health claim was an issue at the time the action was initiated. A plaintiff pursuing a claim under § 1140 must establish a causal link between Plan # 501 benefits and the challenged employer action. *Nixon v. Celotex Corp.,* 693 F.Supp. 547, 555 (W.D.Mich. 1988). Based on the evidence presented, there is nothing to connect the "territory reduction" and Plan # 501 benefits in a manner sufficient to support a reasonable infer-

ence that defendants acted with the requisite specific intent. The only thing connecting the action with the Plan # 501 is Mrs. Torre's statement of her belief that defendants were inspired by an unlawful motive. Her belief is insufficient to create an inference of intentional discrimination and avoid summary judgment. *Cf. Branson,* 853 F.2d at 772; *Montgomery,* 794 F.Supp. at 1068.

Challenged action (2), the "unreasonable quotes," is simply unestablished. Mrs. Torre presents no evidence that she received quotes different from similarly situated Marketing Representatives. As discussed earlier, she claims to have been given "unreasonable" and "inflated" quotes, but she presents no objective or comparative evidence to support her claim. Instead, she provides letters in which she complains of losing business to lower priced competitors and an affidavit in which she states her belief that she was the subject of discrimination. That Federated lost business to competitors with lower priced products simply does not support an inference that Federated intended to supply her with an over-priced product in order to cause her to lose business. At bottom, her claim stands on nothing more than her naked assertions that defendants supplied her with "unreasonable" and "inflated" quotes. Her naked assertions are insufficient to avoid summary judgment. *Cf. Branson,* 853 F.2d at 772; *Montgomery,* 794 F.Supp. at 1068.

■ With respect to challenged actions (3) and (4), the "Topeka office" and "failure to promote," the court finds that there exist genuine issues of material fact which preclude summary judgment.

With respect to challenged action (3), the "Topeka office," it is unclear whether the requisite causal connection is present. Section 1140 "forbids conduct taken for 'the purpose of interfering with the attainment of any right to which [a] participant may become entitled.'" *Zipf v. American Tel. & Tel. Co.,* 799 F.2d 889, 893 (3rd Cir.1986) (quoting § 1140). Trisha's health claim clearly became an issue by December of· 1989. Mr. Lauritzen, the decision-maker responsible for suggesting that Mrs. Torre maintain an office in Topeka, was aware of the health·claim in December of 1989. It is

unclear when the decision to open the Topeka office was made. It is also unclear whether interference with potential benefits was a motivating factor in the ultimate decision to open the office. The timing of the decision is relevant to steps one and three of the *McDonnell Douglas/Burdine* framework. Therefore, the court denies summary judgment as to challenged action (3).

With respect to challenged action (4), "failure to promote," it is clear that Mrs. Torre requested promotion or transfer after December of 1989. It is also clear that she received no promotion or transfer. To avoid summary judgment "[p]laintiff need only establish that at the time of the alleged violation she had the potential of receiving health insurance benefits and that defendants took some action with the specific intent to keep her from obtaining the benefits." *Zimmerman*, 835 F.Supp. at 1289. She need not prove that interference was the sole factor in defendants' decision to interfere with her Plan # 501 rights. *Id.* at 1287. She produces evidence sufficient to raise a genuine issue of fact as to steps one and three of the burden-shifting framework. Specifically, she produces evidence that her failure to promote may have been retaliatory.[33] Defendants produce explanatory evidence sufficient to establish their step-two burden of production.[34] The court finds that there is a genuine issue as to whether challenged action (4) was motivated by an intent to interfere with her rights under Plan # 501. *Cf. Phelps*, 991 F.2d at 649 (noting that a plaintiff is required

to prove, by a preponderance of the evidence, that proscribed employer conduct was motivated by an intent to interfere with employee benefits protected by ERISA). Accordingly, the court denies summary judgment as to this issue.

### 3. Section 1140: Damages

 Defendants move for summary judgment to the extent Mrs. Torre asks for extra-contractual compensatory and punitive damages on her § 1140 claim. Mrs. Torre resists. However, she points to no authority supporting her claim for extracontractual compensatory and punitive damages.

In *Zimmerman v. Sloss Equipment Inc.*, Judge Van Bebber examined whether certain extracontractual compensatory and punitive damages are recoverable for a violation of § 1140. He held they were not.[35] *Id.* at 1292. The issue in *Zimmerman* was whether the Supreme Court's dicta in *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990), should be interpreted to allow recovery of punitive damages and damages for emotional distress.[36] The plaintiff in *Ingersoll–Rand* sought future wages, mental anguish, and punitive damages under a state law claim for wrongful discharge. *Ingersoll–Rand*, 498 U.S. at 136, 111 S.Ct. at 481. In dicta, the Court wrote that "there is no basis in [§ 1132(a)'s] language for limiting ERISA actions to only those which seek 'pension benefits.' It is clear that the relief requested

---

**33.** Mrs. Torre points to evidence which establishes Federated may have considered her pending suit in decisions related to her promotion or transfer. For example, there is evidence that her suit influenced how Mr. Haegele and Mr. Leighty acted on her requests for promotion or transfer. It is unclear whether the relevant decision-makers acted with the specific intent to interfere or discriminate within the meaning of § 1140. The evidence presented is susceptible to more than one reasonable interpretation. Which interpretation prevails may turn on an evaluation of the credibility of the individuals involved.

**34.** Defendants step-two burden is merely one of production. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. They need not persuade a finder of fact that they were actually motivated by the proffered reasons. *Id.* It is sufficient if their evidence raises a genuine issue as to whether they

had the requisite specific intent. *See Id.* at 254–55, 101 S.Ct. at 1094–95.

Mrs. Torre attacks defendants' proffered reasons as being unworthy of credence. Her argument goes to credibility and is to be resolved as part of the step-three question of whether defendants' proffered reasons are a pretext for intentional discrimination.

**35.** As Judge Van Bebber notes, in *Sage v. Automation, Inc. Pension Plan and Trust*, 845 F.2d 885, 888 n. 2 (10th Cir.1988), the Tenth Circuit, in a footnote, made the "blanket statement" that punitives are unavailable in an ERISA action.

**36.** Although Mrs. Torre does not discuss *Ingersoll–Rand*, it appears to be the sole basis for her claim for punitive and extra-contractual damages.

is well within the power of federal courts to provide." *Id.* at 145, 111 S.Ct. at 486.

Judge Van Bebber noted that the *Ingersoll–Rand* dicta led several district courts to conclude that extracontractual compensatory and punitive damages were recoverable under ERISA. *Zimmerman,* 835 F.Supp. at 1291 (citing *Blue Cross and Blue Shield of Alabama v. Lewis,* 753 F.Supp. 345, 347 (N.D.Ala.1990); *International Union, United Automobile, Aerospace and Agricultural Implement Workers v. Midland Steel Prods. Co.,* 771 F.Supp. 860, 863 (N.D.Ohio 1991)). However, he found more persuasive the courts which chose to interpret *Ingersoll–Rand* less expansively. *See Harsch v. Eisenberg,* 956 F.2d 651, 660 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992); *McRae v. Seafarers' Welfare Plan,* 920 F.2d 819, 821 (11th Cir.1991); *Roberts v. Thorn Apple Valley, Inc.,* 784 F.Supp. 1538, 1541 (D.Utah 1992); *O'Neil v. Gencorp, Inc.,* 764 F.Supp. 833, 834 (S.D.N.Y. 1991); *Gaskell v. Harvard Coop. Society,* 762 F.Supp. 1539, 1544 (D.Mass.1991), *vacated on other grounds,* 3 F.3d 495 (1st Cir.1993). Specifically, Judge Van Bebber wrote as follows: "[t]his court agrees with the conclusion reached by the *Harsch, McRae, Roberts,* and *Gaskell* courts that the dicta in *Ingersoll–Rand* should not be interpreted so expansively as to overturn the well-established line of cases holding that extracontractual damages were not available under ERISA § 502." *Zimmerman,* 835 F.Supp. at 1291. The court concurs with Judge Van Bebber and, accordingly, does not interpret the *Ingersoll–Rand* dicta expansively.

Section 1132(a) provides the exclusive remedies for actions under § 1140. *Ingersoll–Rand,* 498 U.S. at 145, 111 S.Ct. at 486. These remedies are set forth in 1132(a)(1)(B) and (a)(3). *Zimmerman,* 835 F.Supp. at 1290. Unless there is basis for punitive and extra-contractual damages in either § 1132(a)(1)(B) or (a)(3), Mrs. Torre cannot recover them.

Section 1132(a)(1)(B) states that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." With the repeated use of the phrase "under the terms of the plan," the language of this section seems to limit plaintiffs to benefits to which they are contractually entitled. *See Harsch,* 956 F.2d at 655 (writing that the language of 1132(a)(1)(B) "appears to limit beneficiaries to contractual claims by providing only for actions based upon or arising 'under the terms of the plan'"). Indeed, although not in a case involving § 1140, the Supreme Court has acknowledged that § 1132(a)(1)(B) "says nothing about the recovery of extracontractual damages." *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 144, 105 S.Ct. 3085, 3091, 87 L.Ed.2d 96 (1985). Mrs. Torre cites no authority which would support reading 1132(a)(1)(B) to allow extracontractual damages. Mindful of the "strong opposition to the judicial expansion of ERISA's remedies," *Harsch,* 956 F.2d at 656, the court is unable to read the plain language of § 1132(a)(1)(B) to authorize the recovery of extracontractual compensatory or punitive damages. Therefore, the court holds that extracontractual compensatory and punitive damages are unavailable to Mrs. Torre under § 1132(a)(1)(B). *Cf. Medina v. Anthem Life Ins. Co.,* 983 F.2d 29, 31–32 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993) (holding that neither punitive nor extra-contractual damages are available under § 1132(a)(1)(B)); *Harsch,* 956 F.2d at 656 (same).

Section 1132(a)(3) does not mention recovery of punitive or extracontractual damages. However, it does allow a participant or beneficiary "to obtain other appropriate equitable relief." 29 U.S.C. 1132(a)(3)(B). The court's research reveals that the overwhelming weight of authority holds that extracontractual compensatory and punitive damages are unavailable under 1132(a)(3).[37] Mrs. Torre

37. In *Mertens v. Hewitt Assocs.,* —— U.S. ——––––, 113 S.Ct. 2063, 2069, 124 L.Ed.2d 161 (1993), the Supreme Court held that damages were not available under § 1132(a)(3)(B) as "other appropriate equitable relief." *See Spinelli v. Gaughan,* 12 F.3d 853, 857 & n. 3 (9th Cir. 1993) (writing, in a case involving § 1140, that *Mertens* held damages unavailable for a violation

presents no reason to depart from established authority and hold that extracontractual compensatory and punitive damages constitute "other appropriate equitable relief."

The relief Mrs. Torre requests must have some basis in either § 1132(a)(1)(B) or (a)(3). Section 1132(a)(1)(B) allows for the recovery of contractual damages and § 1132(a)(3)(B) allows for the recovery of "other appropriate equitable relief." Neither § 1132(a)(1)(B) nor (a)(3) provide for extracontractual compensatory or punitive damages. Accordingly, to the extent Mrs. Torre asks for relief not provided by § 1132(a)(1)(B) or (a)(3), the court grants defendants' motion summary judgment.[38]

## C. ERISA Preemption: Plaintiffs' Remaining Claims

Defendants argue that ERISA preempts plaintiffs' remaining claims. Plaintiffs' remaining claims are as follows: (1) violation of Minnesota Statutes Chapter 62A; (2) breach of employment contract; (3) Mrs. Torre's claim for intentional infliction of emotional distress; (4) Mrs. Torre's claim for intentional infliction of emotional distress on Trisha's behalf; and (5) tortious interference with prospective business advantage.

Whether a federal law preempts a state cause of action is a question of congressional intent. *Ingersoll–Rand*, 498 U.S. at 137–38, 111 S.Ct. at 482 (quoting *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105 S.Ct. 1904, 1910, 85 L.Ed.2d 206 (1985)). Congress placed a sweeping provision in ERISA which preempts "all State laws insofar as

they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).

ERISA preemption turns on the words "relate to." *Airparts Co. v. Custom Ben. Services of Austin*, 828 F.Supp. 870, 873 (D.Kan.1993). A state law "relates to" an employee benefit plan if it has a connection with or reference to such a plan. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). Thus, a state law may relate to an employee benefit plan, and thereby be preempted by § 1144(a), even if the law is not specifically designed to affect such a plan, or the effect is only indirect. *Ingersoll–Rand Co.*, 498 U.S. at 139, 111 S.Ct. at 483.

Giving broad meaning to the words "relate to," the Tenth Circuit has held that ERISA preempts common law tort claims brought by employees where "the factual basis of the cause of action involves an employee benefit plan." *Monarch Cement Co. v. Lone Star Industries, Inc.*, 982 F.2d 1448, 1452 (10th Cir.1992) (quoting *Settles v. Golden Rule Ins. Co.*, 927 F.2d 505, 509 (10th Cir.1991)) (internal quotes omitted).

However, there are limits to the scope of ERISA preemption. *Ingersoll–Rand Co.*, 498 U.S. at 139, 111 S.Ct. at 483. ERISA does not preempt state actions that are only remotely or tangentially related to an employee benefit plan. *See Shaw*, 463 U.S. at 100 n. 21, 103 S.Ct. at 2901–02 (writing that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan").

of § 1132(a)(3)(B)). The Court wrote that "though we have never interpreted the precise phrase 'other appropriate equitable relief,' we have construed the similar language of Title VII ... —'any other equitable relief as the court deems appropriate,'' ... —"to preclude 'awards for compensatory or punitive damages.'" *Mertens*, —— U.S. ——, ——–——, 113 S.Ct. 2063, 2067–69, 124 L.Ed.2d 161, 169–70 (citation omitted).

On several occasions, the Tenth Circuit has held that § 1132(a)(3)(B) does not authorize extra-contractual compensatory damages. *Alexander v. Anheuser Busch Companies, Inc.*, 990 F.2d 536, 539–540 (10th Cir.1993); *Lafoy v. HMO Colorado*, 988 F.2d 97, 100 (10th Cir.1993). In

*Lafoy v. HMO Colorado*, the Tenth Circuit provides a list of the circuits holding that extracontractual damages are unavailable under § 1132(a)(3)(B). *Lafoy*, 988 F.2d at 100 n. 5.

Additionally, the weight of authority holds that punitive damages are not recoverable under § 1132(a)(3)). *See Harsch*, 956 F.2d at 661 (providing a list of circuits holding that punitive damages are unavailable under § 1132(a)(3)). These cases are not limited to pre-*Ingersoll–Rand* decisions. *See, e.g., Harsch*, 956 F.2d at 661; *Zimmerman*, 835 F.Supp. at 1292; *O'Neil*, 764 F.Supp. at 835–36.

38. *Accord Lawford v. New York Life Ins. Co.*, 739 F.Supp. 906, 914–15 (S.D.N.Y.1990).

In *National Elevator Industry, Inc. v. Calhoon*, 957 F.2d 1555, 1558 (10th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 406, 121 L.Ed.2d 331 (1992), the Tenth Circuit noted that there is no simple test to determine whether a state action "relates to" an employee benefit plan. The Tenth Circuit differentiated laws of general application involving traditional areas of state regulation from four categories of laws that have been held to "relate to" employee benefit plans. *National Elevator*, 957 F.2d at 1558–59. The four types of laws preempted by ERISA are as follows:

> First, laws that regulate the type of benefit or terms of ERISA plans. Second, laws that create reporting, disclosure, funding, or vesting requirements for ERISA plans. Third, laws that provide rules for the calculation of the amount of benefits to be paid under ERISA plans. Fourth, laws and common-law rules that provide remedies for misconduct growing out of the administration of the ERISA plan.

*Id.* (quoting *Martori Brothers Distributors v. James–Massengale*, 781 F.2d 1349 (9th Cir.), cert. denied, 479 U.S. 1018, 107 S.Ct. 670, 93 L.Ed.2d 722 (1986)).

**1. Minnesota Chapter 62A**

█ Plaintiffs claim defendants violated Minnesota Statutes §§ 62A.141 and 62A.151. These two sections state prerequisites to the issuance or renewal of certain types of insurance within Minnesota. Specifically, § 62A.141 requires certain policies to contain provisions which extend coverage to handicapped dependents and § 62A.151 requires certain policies to contain provisions which extend coverage to emotionally handicapped children. Both clearly are laws that "relate to" an employee benefit plan within the meaning of 29 U.S.C. § 1144(a). However, these sections are saved from § 1144(a) by the insurance saving clause of § 1144(b)(2)(A).

ERISA's saving clause provides that "except as provided in the [deemer clause], nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance." 29 U.S.C. § 1144(b)(2)(A). Sections 62A.141

and 62A.151 directly control the terms of insurance contracts by requiring that they contain provisions extending certain types of coverage. *Cf. FMC Corp. v. Holliday*, 498 U.S. 52, 61, 111 S.Ct. 403, 409, 112 L.Ed.2d 356 (1990) (during its examination of whether saving clause applied, the Supreme Court noted that the subject statute "directly controls" the terms of insurance contracts). These two sections are aimed specifically at the insurance industry. *Cf. Id.* (noting that the subject law "does not merely have an impact on the insurance industry; it is aimed at it"). Therefore, unless these two sections are excluded from the reach of the saving clause by the deemer clause, they are not preempted. *Cf. Id.*

In pertinent part, the deemer clause provides that "[n]either an employee benefit plan ... nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, ... or to be engaged in the business of insurance ... for purposes of any law of any State purporting to regulate insurance companies, [or] insurance contracts." 29 U.S.C. § 1144(b)(2)(B). The deemer clause exempts self-funded ERISA plans from state laws that regulate insurance within the meaning of the saving clause. *FMC Corp.*, 498 U.S. at 61, 111 S.Ct. at 409.

█ The deemer clause does not apply in the instant case. A plan is considered to be self-funded when "it does not purchase an insurance policy from any insurance company in order to satisfy its obligations to its participants." *Id.* at 54, 111 S.Ct. at 405. Plan # 501 is not self-funded. Plan # 501 is an insured plan. Federated is issuer, purchaser, and ERISA Administrator. As the Supreme Court explained in *FMC Corp. v. Holliday*,

> employee benefit plans that are insured are subject to indirect insurance regulation. An insurance company that insures a plan remains an insurer for purposes of state laws "purporting to regulate insurance" after application of the deemer clause. The insurance company is therefore not relieved from state regulation. The ERISA plan is consequently bound by

state insurance regulations insofar as they apply to the plan's issuer. *Id.* at 61, 111 S.Ct. at 409. Since Plan # 501 is an insured plan, it is bound by §§ 62A.141 and 62A.151 insofar as they apply to Federated, as issuer. *See Id.* at 64, 111 S.Ct. at 411 (stating that "if a plan is insured, a State may regulate it indirectly through regulation of its insurer and its insurer's contracts.").

## 2. Breach of Employment Contract

■ It is unclear, but apparently Federated argues that ERISA preempts Mrs. Torre's breach of contract claim. After examining the pretrial order, it is clear that her breach of contract claim is based on facts independent of her ERISA action. Indeed, most of the alleged breaches bear no temporal relationship whatsoever to Trisha's health claims (e.g., the April 14, 1988, attempt to amend her "Territory Assignment"). The factual foundation of her breach of contract claim is independent of, and unrelated to, her ERISA claims. Therefore, the court holds that ERISA does not preempt her claim for breach of contract.

## 3. Intentional Infliction: Mrs. Torre

■ In the pretrial order, Mrs. Torre contends that she suffered emotional distress as a result of defendants' alleged sex discrimination in violation of Title VII. In their memorandum in support of their motion for summary judgment, defendants argue that Mrs. Torre bases her claim on their handling of Trisha's medical claim. They do not acknowledge that she has a basis for her claim independent of her allegations regarding the administration of Plan # 501. Nor do they argue that actions allegedly constituting sex discrimination relate to the administration of Plan # 501. Their motion does not address her claim as it has been limited by the pretrial order. As limited by the pretrial order, the factual basis of her claim does not involve Plan # 501. *Cf. Monarch Cement,* 982 F.2d

at 1452 (explaining that a common law tort claim is preempted " 'if the factual basis of the cause of action involves an employee benefit plan' ") (quoting *Settles,* 927 F.2d at 509). Therefore, the court holds that ERISA does not preempt her claim as framed.

## 4. Intentional Infliction: Trisha Torre

■ Mrs. Torre contends that Trisha suffered emotional distress as a result of Federated's decisions regarding Trisha's eligibility for benefits under Plan # 501. Her claim is based solely on Federated's administration of Plan # 501. The factual basis of Trisha's emotional distress claim is inseparable from plaintiffs' underlying cause of action under § 1132(a)(1)(B). Her claim is simply an attempt to obtain a common-law remedy for Federated's alleged misconduct in the administration of Plan # 501. Thus, her claim clearly falls within the fourth category of cases listed by the Tenth Circuit in *National Elevator.*[39] The court is persuaded that ERISA preempts her claim.

## 5. Tortious Interference

■ Mrs. Torre contends that defendants Mr. Haegele and Mr. Lauritzen tortiously interfered with her prospective business advantage by providing her with "inflated" and "unreasonable" price quotes. Essentially, defendants argue that her claim is inextricably intertwined with her ERISA claims. Defendants do not acknowledge the possibility of an independent basis for her tortious interference claim. However, the pretrial order frames, and Mrs. Torre presents, this claim in such a way that it bears no relationship to Plan # 501 or its administration. That is, she presents the claim in such a way that its factual basis does not involve Plan # 501. Therefore, ERISA does not preempt her claim for intentional interference with prospective business advantage. *Cf. Monarch Cement,* 982 F.2d at 1452 (explaining that a common law tort claim is preempted

---

39. Courts have held that ERISA preempts a related claim for intentional infliction of emotional distress. *See, e.g., Kuhl v. Lincoln Nat. Health Plan,* 999 F.2d 298, 303–04 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994); *Johnson v. Dist. 2 Marine Eng. Beneficial Ass'n,* 857 F.2d 514, 517 (9th Cir.1988); *Lennon v. Walsh,* 798 F.Supp. 845, 849 (D.Mass. 1992); *Thomas v. Telemecanique Inc.,* 768 F.Supp. 503, 506 (D.Md.1991); *Davis v. John Alden Life Ins. Co.,* 746 F.Supp. 44, 49 (D.Kan. 1990); *Pane v. RCA Corp.,* 667 F.Supp. 168, 173 (D.N.J.1987), *aff'd,* 868 F.2d 631 (3rd Cir.1989).

" 'if the factual basis of the cause of action involves an employee benefit plan' ") (quoting *Settles*, 927 F.2d at 509).

### D. *Minnesota Chapter 62A*

 Plaintiffs claim a violation of Minnesota Statutes §§ 62A.141 and 62A.151. They assert this claim against only Federated and John Cummings. Plaintiffs and defendants both move for summary judgment. The court grants defendants' motion for summary judgment.

Section 62A.151 requires certain insurance policies to extend coverage for the care of emotionally handicapped children. In pertinent part, § 62A.151 provides as follows:

> No policy or plan of health, medical, hospitalization, or accident and sickness insurance regulated under this chapter, ... shall be delivered, issued, executed or renewed in this state, or approved for issuance or renewal in this state by the commissioner of commerce, after July 1, 1975, unless the policy or plan includes and provides health service benefits to any subscriber or other person covered thereunder, on the same basis as other benefits, for the treatment of emotionally handicapped children in a residential treatment facility licensed by the commissioner of human services.

By its clear terms, § 62A.151 states a prerequisite to the issuance or renewal of certain types of insurance within Minnesota. Accordingly, for Federated to deliver, issue, execute, or renew Plan # 501 in Minnesota, Plan # 501 must "include[ ] and provide[ ]

health service benefits ... for the treatment of emotionally handicapped children in a residential treatment facility licensed by the commissioner of human services." In Rider three, Plan # 501 states as follows: "[t]he policy will provide coverage for the treatment of emotionally handicapped children in a licensed residential treatment facility, as defined by the state of Minnesota." Plan # 501 contains the coverage required by 62A.151. Whether Federated complied with the terms contained in Rider three is not a question to which § 62A.151 is addressed. Plaintiffs do not state a claim under § 62A.151.

Similarly, plaintiffs argue defendants violated Minn.Stat. § 62A.141. Section § 62A.141 requires certain insurance policies to extend coverage for handicapped dependents. Like § 62A.151, § 62A.141 states a prerequisite to the issuance or renewal of certain types of insurance within Minnesota. Plaintiffs do not argue that Plan # 501 lacks the requisite contractual provision. Her argument relates to defendants' alleged failure to comply with the terms of Plan # 501. Plaintiffs fail to state a claim under § 62A.141.

### E. *Breach of Employment Contract*

On February 10, 1988, in Topeka, Kansas, Mrs. Torre entered into a written employment contract with Federated.[40] She contends that her employment contract unambiguously provided her with exclusive marketing rights for all of Shawnee County, Kansas. She argues that Federated breached her employment contract in two [41] ways:

---

**40.** The parties do not dispute that Kansas contract law applies. *See Jameson v. Pack*, 815 F.Supp. 410, 413 (D.Kan.1993) (noting that Kansas applies the law of the state where the contract was made); *State Farm Mutual Auto. Ins. Co. v. Baker*, 14 Kan.App.2d 641, 797 P.2d 168, 171 (1990) (noting that, under Kansas law, which state's law applies to the construction of a contract depends on where the last act necessary to complete the contract occurs).

**41.** She also argues that Federated breached her contract by forcing her to open an office in Topeka. In the "Marketing Representative's Employment Contract" signed by Mrs. Torre on February 10, 1988, paragraph seven states that the employment contract incorporates the "Mar-

keting Representatives' Administration Manual" and the "Life Insurance Manual."

Mrs. Torre contends that forcing her to open the Topeka office was a breach of her contract, but she points to no provision from her "Marketing Representatives' Employment Contract," "Marketing Representatives' Administration Manual," or "Life Insurance Manual" to support her claim. Instead, she points to provisions from the "District Managers' Marketing Administration Manual." Paragraph seven does not refer to this document. Mrs. Torre points to no provision within her three specified contractual documents that incorporates the "District Managers' Administration Manual."

In short, Mrs. Torre provides no contractual basis for her claim regarding the Topeka office.

(1) by denying her exclusive marketing rights; and (2) by decreasing her assigned territory. Both parties move for summary judgment.

### 1. Exclusive Territory Assignment

■ Mrs. Torre argues that her employment contract granted her exclusive marketing rights within the assigned territory. She contends that Federated breached by (1) assigning another Marketing Representative, Mr. Richardson, to share Topeka, (2) limiting her to a "prospect list" within her assigned territory, and (3) giving her only a fraction of the new business within Topeka.

The first issue is whether the employment contract grants Mrs. Torre exclusive marketing rights. If the contract does not grant her exclusive marketing rights, her claim fails. Mrs. Torre argues that the court is bound to enforce the clear and unambiguous terms of the contract. The court agrees. *See, e.g., Fast v. Kahan*, 206 Kan. 682, 481 P.2d 958, 961 (1971) (stating that "in the absence of fraud or mutual mistake, a clear and unambiguous contract must be enforced according to its terms"). She next argues that the contract nowhere states that it is non-exclusive, therefore, the contract clearly and unambiguously provides her with exclusive marketing rights. The court disagrees.

Mrs. Torre provides no authority in support of her exclusivity argument. Instead, she merely asserts that the contract does not state that her territory is non-exclusive, from which, reasoning by negative implication, she concludes that her contract "clearly and unambiguously" grants her exclusive marketing rights in the assigned territories. The court rejects her argument because the contract states that "territories" are not assigned exclusively to one marketing representative.

■ A cardinal principle of contract law is that a court must enforce an unambiguous contract according to its terms. *Id.* 481 P.2d at 961. That is, where a contract is unambiguous, the written agreement determines the parties' rights. *St. Paul Surplus*

*Lines v. Intern. Playtex*, 245 Kan. 258, 777 P.2d 1259, 1268 (1989), *cert. denied*, 493 U.S. 1036, 110 S.Ct. 758, 107 L.Ed.2d 774 (1990). Neither party argues that the contract is ambiguous. The court agrees and finds that it is unambiguous. The interpretation of an unambiguous contract is a judicial function that requires the court to ascertain the parties' intent from the four corners of the instrument. *See, e.g., Rupe v. Triton Oil & Gas Corp.*, 806 F.Supp. 1495, 1500 (D.Kan. 1992); *United States v. Ables*, 739 F.Supp. 1439, 1445 (D.Kan.1990); *Wood River Pipeline v. Willbros Energy*, 241 Kan. 580, 738 P.2d 866, 869 (1987) (quoting *Hall v. Mullen*, 234 Kan. 1031, 678 P.2d 169 (1984)); *Southwest Nat. Bank v. Simpson and Son*, 14 Kan.App.2d 763, 799 P.2d 512, 517 (1990). Accordingly, the court determines the parties' rights from the contract itself.[42]

The document entitled "Marketing Representative's Employment Contract," which Mrs. Torre signed on February 10, 1988, repeatedly refers to the Marketing Representative's assigned "territory." The "Marketing Representative's Employment Contract" first refers to the term "territory" in paragraph two which states that the "Marketing Representative agrees that within the assigned territory he will solicit and procure for Employer applications for Property, Casualty, Health, and Life Insurance." There is no indication that the term "territory" has a different meaning when used elsewhere in the contract.

Paragraph seven of the "Marketing Representative's Employment Contract" further provides that "[i]t is agreed that this Employment Contract shall be deemed as having incorporated herein as fully as if set forth in full all rules, provisions and instructions in the Marketing Representatives' Administration Manual issued by Employer in force and effect on the date of this Employment Contract."

Although the "Marketing Representative's Employment Contract" does not define the term "territory," the "Marketing Representatives' Administration Manual" does. In

---

42. The court notes that the contract contains a merger clause which bars consideration of pa-

role evidence. *Cf. Ables*, 739 F.Supp. at 1445.

section four, subsection one, the "Marketing Representatives' Administration Manual" discusses the general rules for Federated's compensation plan. In paragraph two, the manual provides as follows:

> TERRITORY AND JOINT TERRITORY DEFINED—COMMISSION ALLOCA- TION The term 'territory' wherever used in this Premium Plan of Compensation means the assigned territory covered in paragraph 2 of the marketing representative's employment contract. **The territory is not assigned exclusively to one marketing representative.**

(Emphasis added).[43]

The "Marketing Representatives' Administration Manual" is a part of Mrs. Torre's contract. In paragraph two, the "Manual" states that the term "territory," as used in its discussion of the compensation plan, has the same meaning as the term "territory" used in paragraph two of the "Marketing Representative's Employment Contract." Paragraph two of the "Manual" clearly and unambiguously states that "the territory is not assigned exclusively to one marketing representative."

Mrs. Torre's sole argument is one of negative implication. She reasons that the absence of a definition stating that a "territory" is non-exclusive necessarily means that the contract grants exclusive rights when it assigns a territory. However, contrary to her assertions, the contract defines "territory." The definition appears in the "Manual" and the "Manual" is part of her employment contract. The definition specifically refers to the term as used in her "Marketing Representative's Employment Contract" and it clearly states that territories are not assigned exclusively to one Marketing Representative. Mrs. Torre points to no provision which states that a Marketing Representative receives an exclusive territory. Thus, applying the plain language of the contract, Mrs. Torre's contract did not assign any territory exclusively to her.

The only way the court can conclude that the contract assigns territory to Mrs. Torre exclusively is to insert words into the contract that import an intent opposite to that clearly expressed within the four corners of the document. Kansas law forbids courts from rewriting contracts in such a manner. See, e.g., Quenzer v. Quenzer, 225 Kan. 83, 587 P.2d 880, 882 (1978) (stating that "[w]ords cannot be written into a contract which import an intent wholly unexpressed when it was executed"). Therefore, her claim for breach of exclusive rights to assigned territory is without merit. The court grants Federated's motion for summary judgment as to the exclusivity portion of Mrs. Torre's breach of employment contract claim.

### 2. Unilateral Modification

█ Mrs. Torre argues that Federated breached her employment contract by decreasing her assigned territory. On February 10, 1988, her contract contained a "Territory Assignment" which provided that "[y]our assigned territory is as follows: Counties of Lyon, Chase, Coffey, Greenwood, Osage (except the cities of Overbrook, Carbondale, and Scranton), Marion (except the town of Goessel), and Woodson: all in the State of Kansas. Also includes Shawnee County." On April 14, 1988, Federated sent her a "Territory Assignment Correction" which purportedly amended her assigned territory by substituting the phrase "the City of Topeka in Shawnee County" for "[a]lso includes Shawnee County." Thus, following the purported amendment, her "Territory Assignment" specifically limited her to Topeka, whereas before the amendment the "Assignment" referred to Shawnee County generally.

Mrs. Torre points out that Federated neither properly amended the contract by adhering to the procedures set out in paragraph 13 nor properly modified the contract by supplying consideration for the April 14, 1988 amendment. Paragraph 13 of the "Marketing Representative's Employment

---

**43.** After stating that "territory is not assigned exclusively to one marketing representative," paragraph two explains how Marketing Representatives are compensated when multiple representatives are assigned to the same territory. Defendants' Appendix of Exhibits, Volume II, at # 74.

Contract" contains a merger clause and regulates the waiver or amendment of the provisions of the parties' employment contract. Paragraph 13 provides as follows:

> **This Employment Contract contains the entire agreement between the parties. Any oral agreements, representations or waivers made by either party or alleged to have been made by either party before or after signing of this contract shall for all purposes be superseded and replaced by the written provisions hereof.** It is further agreed and understood that Employer's Division Marketing Manager or Regional Marketing Manager are the only persons who have the right or authority to waive or amend any of the provisions of this Employment Contract on behalf of Employer. **No such waiver or amendment shall be valid or effective for any purpose whatsoever unless embodied in a written endorsement of this Employment Contract which endorsement must be signed by Employer's Division Marketing Manager or Regional Marketing Manager and by Marketing Representative.**

Federated does not argue that the April 14, 1988, amendment complied with paragraph 13. Nor does Federated argue that the amendment was a legally effective modification. Instead, Federated argues that, according to the parties' agreement, Mrs. Torre's territory was to include only Topeka and not all of Shawnee County. Federated further argues that the February 10, 1988, "Territory Assignment" contained a clerical error in its description of her territory.

Essentially, Federated argues mutual mistake of fact due to scrivener's error.[44] Federated seeks reformation. "Reformation is an ancient remedy used to reframe a written contract to reflect accurately the real agreement between the contracting parties when, either through mutual mistake or unilateral mistake coupled with actual or equitable fraud by the other party, the writing does not embody the contract as actually made." *Mutual of Omaha Ins. Co. v. Russell,* 402 F.2d 339, 344 (10th Cir.1968), *cert. denied,* 394 U.S. 973, 89 S.Ct. 1456, 22 L.Ed.2d 753 (1969). Reformation is available to correct mutual mistakes of fact. *Conner v. Koch Oil Co.,* 245 Kan. 250, 777 P.2d 821, 825 (1989).

In its memorandum in support of its motion for summary judgment, Federated first argues that its purported amendment of the original "Territory Assignment" actually "reformed" the parties' contract. Parties may agree to modify their contract, but one party to the contract may not "reform" it by forcing an amendment upon the other. Federated's argument that the amendment was merely a reformation of a contract containing a scrivener's error is without merit.

■ Federated also seems to request that the court reform the contract to reflect the parties' true agreement.[45] It points to parol evidence to support its claim that the February 10, 1988, "Territory Assignment" does not accurately reflect the parties' true agreement. Parol evidence is inadmissible to alter or vary the terms of a contract that is complete, unambiguous, and free from uncertainty. *See, e.g., Simon v. Nat. Farmers Organization, Inc.,* 250 Kan. 676, 829 P.2d

---

**44.** In *International Union v. Murata Erie North America,* 980 F.2d 889, 907 (3rd Cir.1992), the Third Circuit explained generally that "[u]nder the doctrine of scriveners' error, the mistake of a scrivener in drafting a document may be reformed based upon parol evidence, provided the evidence is 'clear, precise, convincing and of the most satisfactory character' that a mistake has occurred and that the mistake does not reflect the intent of the parties."

**45.** In *Geiger v. Hansen,* the Kansas Supreme Court, quoting 3 *Jones on Evidence,* (6th Ed.) Gard, § 16.4, wrote that " 'in ... actions, legal or equitable in their nature, brought on written instruments, either party is at liberty under proper pleadings to prove a mistake, and to have

reformation of the contract.' " *Geiger v. Hansen,* 214 Kan. 83, 519 P.2d 699, 702 (1974).

*The Restatement (Second) of Contracts* § 155 (1981) states the general rule regarding reformation of a writing to correct a mutual mistake as follows:

> Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

*In re Owen,* 101 B.R. 266, 268 (D.Kan.1989).

884, 887–88 (1992). However, "[p]arol evidence is admissible to show that the purported agreement is not the true one, by reason of the parties' mutual mistake." *Brown v. Equitable Life Assur. Soc. of U.S.*, 766 F.Supp. 928, 932 (D.Kan.1991) (citing *Rosenbaum v. Texas Energies, Inc.*, 241 Kan. 295, 736 P.2d 888 (1987)). *See also Snider v. Marple*, 168 Kan. 459, 213 P.2d 984, 989 (1950) (writing that "[t]he very purpose of an action for reformation is to have an instrument altered to make it state the true agreements of the parties to it, and the fact the instrument sought to be reformed is couched in clear and unambiguous language does not preclude inquiry as to whether it expressed the agreement").

"Reformation 'can never be employed to make a new contract or to supply terms upon which the minds of the parties never met.' " *Coleman Co., Inc., v. California Union Ins. Co.*, 960 F.2d 1529, 1537 (10th Cir.1992) (quoting *Waddle v. Bird*, 122 Kan. 716, 253 P. 576, 577 (1927)). To obtain relief, Federated must show mutuality of mistake. *Brown*, 766 F.Supp. at 932. Specifically, Federated "must show by clear and convincing evidence that it was the intention of all the parties concerned to make an instrument as is sought to be established." *See Id.* After examining the record, and applying the clear and convincing standard, the court finds that there remains a genuine issue regarding Federated's claim of mutual mistake of fact due to scrivener's error. Accordingly, the court denies the parties' motions for summary judgment as to plaintiffs' "unilateral modification" claim.

### F. *Intentional Infliction of Emotional Distress: Mrs. Torre*

■■■ As previously noted, Mrs. Torre argues that defendants' alleged acts of Title VII sex discrimination constitute intentional infliction of emotional distress. Defendants move for summary judgment.

■■■ Kansas recognizes a cause of action for intentional infliction of emotional distress, also known as the tort of outrage. *See, e.g., Anspach v. Tomkins Industries, Inc.*, 817 F.Supp. 1499, 1507 (D.Kan.1993); *Roberts v. Saylor*, 230 Kan. 289, 637 P.2d 1175, 1179

(1981). To establish intentional infliction of emotional distress Mrs. Torre must prove that (1) defendants acted intentionally or in reckless disregard of her, (2) defendants' conduct was extreme and outrageous, (3) there is a causal connection between defendants' conduct and her emotional distress, and (4) her emotional distress must be extreme and severe. *Burgess v. Perdue*, 239 Kan. 473, 721 P.2d 239, 242 (1986). In *Roberts v. Saylor*, the Kansas Supreme Court explained as follows:

> Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) Whether the defendant[s'] conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by the plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it.

*Roberts*, 637 P.2d at 1179 (citations omitted).

■■■ The threshold for an intentional infliction claim "is necessarily high to separate meritorious claims from those based on trivialities or hyperbole." *Rupp v. Purolater Courier Corp.*, 790 F.Supp. 1069, 1073 (D.Kan.1992). The Kansas Supreme Court has provided guidance as to what conduct should be considered extreme and outrageous. In *Roberts*, the Court instructed that "liability may be found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Roberts*, 637 P.2d at 1179 (citing *Dotson v. McLaughlin*, 216 Kan. 201, 531 P.2d 1, 8 (1975)). A court may find that conduct is sufficient for liability to attach if an ordinary citizen, upon hearing the facts, is led to resentment of the actor and would spontaneously exclaim, "Outrageous!" *See Wright v. Montgomery Ward & Co., Inc.*, 814 F.Supp. 986, 991 (D.Kan.1993), *aff'd*, 25 F.3d 1059 (10th Cir.1994); *Roberts*, 637 P.2d at 1179; *Dotson*, 531 P.2d at 8.

Mrs. Torre bases her claim on conduct which she contends to be sex discrimination in violation of Title VII. Specifically, she argues that defendants are liable for intentional infliction of emotional distress because they (1) condoned and participated in sex discrimination and (2) retaliated against her because she opposed sex discrimination.[46] Courts have found instances of intentional infliction of emotional distress in the employment setting. *See, e.g., Laughinghouse v. Risser,* 754 F.Supp. 836, 845 (D.Kan.1990) (plaintiff subjected to harassment and abuse, over a two-year period, in the form of screaming and cursing, unwanted touchings and sexual comments, fits of rage, threats of loss of employment, and inhibition of job performance); *Gomez v. Hug,* 7 Kan.App.2d 603, 645 P.2d 916, 922 (1982) (plaintiff repeatedly subjected to racial slurs and physical intimidation). However, in *Laughinghouse v. Risser,* Judge Rogers noted that "Kansas courts have been reluctant to extend the outrage cause of action to discrimination claims, including claims of sexual harassment, arising in the employment setting." *Laughinghouse,* 754 F.Supp. at 843. Similarly, in *Rupp v. Purolater Courier Corp.,* Judge Theis stated that "employment discrimination by itself, without the aggravating factors present in *Gomez,* would not amount to outrage." *Rupp,* 790 F.Supp. at 1073.

After examining the extensive record, the court finds that the factors which distinguish *Gomez* and *Laughinghouse* are not present in this case. In the instant case, Mrs. Torre does not base her Title VII claims on, nor does she argue, abusive work environment or constructive discharge. Additionally, she presents no direct evidence of sex discrimination. The court cannot find that defendants' alleged acts of sex discrimination, even if Mrs. Torre's allegations are true, rise to the required level of intolerability. Instead, the court finds her allegations more akin to those made in employment discrimination suits in which the courts found the requisite intolera-

bility to have been absent. *See, e.g., Rupp,* 790 F.Supp. at 1073–1074; *Freeman v. Kansas State Network, Inc.,* 719 F.Supp. 995, 999–1000 (D.Kan.1989); *Haehn v. City of Hoisington,* 702 F.Supp. 1526, 1530 (D.Kan. 1988); *Smitley v. Cigna Corp.,* 640 F.Supp. 397, 401 (D.Kan.1986); *Polson v. Davis,* 635 F.Supp. 1130, 1151 (D.Kan.1986); *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1261–62 (D.Kan.1984); *Elliott v. Employers Reinsurance Corp.,* 534 F.Supp. 690, 691 (D.Kan.1982).

While the court does not wish to diminish the severe psychological trauma Mrs. Torre contends she suffered as a result of defendants' alleged discriminatory conduct, she points the court to no authority sufficient to find that defendants' conduct was so extreme and outrageous as to give rise to a cause of action for intentional infliction of emotional distress. Therefore, defendants' motion for summary judgment is granted as to Mrs. Torre's claim for intentional infliction of emotional distress.

### G. Tortious Interference With Prospective Business Advantage

■ Mrs. Torre bases her tortious interference claim on her allegation that Mr. Haegele and Mr. Lauritzen provided her with "inflated" and "unreasonable" price quotes. She sues only Mr. Haegele and Mr. Lauritzen on this claim. Defendants move for summary judgment.

■ Kansas recognizes the tort of intentional interference with a prospective business relationship. *Turner v. Halliburton Co.,* 240 Kan. 1, 722 P.2d 1106, 1115 (1986). To establish tortious interference with a prospective business relationship, Mrs. Torre must prove the following: (1) the existence of a business relationship or expectancy with the probability of future economic benefit to her; (2) knowledge of the relationship or expectancy by defendants; (3) that, except

---

**46.** She points to the following conduct by defendants: (1) failure to promote or transfer her; (2) forcing her to open a Topeka office; (3) restricting her sales territory; (4) providing her with unreasonable price quotes; (5) failing to give her the Leadership Council Award in 1991; (6) failing to recognize her as a "Big Hitter" at the

annual "kick-off" meeting; (7) failing to provide females with ready-made blazers; and (8) miscellaneous conduct at a training session (such as, providing different accommodations for women, showing a film of a man defecating, and generally reinforcing "masculine stereotypical personality traits").

for defendants' conduct, she was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendants; and (5) damages suffered as a direct and proximate cause of defendants' misconduct. *See Id.*

As part of her claim, Mrs. Torre must show that defendants engaged in intentional misconduct. To satisfy this element, she alleges that they intentionally supplied her with "inflated" and "unreasonable" price quotes. She has made this allegation as part of other claims addressed in this Memorandum and Order. As previously explained, Mrs. Torre provides no evidence by which a finder of fact reasonably may conclude that defendants intentionally fed her noncompetitive quotes in an attempt to cause her to lose business. She supports her allegation with no evidence apart from an affidavit in which she states her belief that she received inflated quotes, several letters in which she complains of losing business to lower-priced competitors, and one unidentified "sample price quote document." She also provides what she characterizes as a summary of average quotes, but she provides no basis for her results.[47] There is no evidence that she received quotes less favorable than other Marketing Representatives who served similar clients with similar levels of risk. Her speculation and conclusory allegations are insufficient to establish the requisite intentional misconduct. Since she fails to make a showing sufficient to establish the existence of an essential element of her claim, on which she bears the burden of proof, the court grants defendants' motion for summary judgment. *See Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552 (stating that "the plain language of Rule 56(c) mandates entry of summary judgment, . . ., against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial").

## H. *Plaintiffs' Objection*

■ Plaintiffs move objecting to defendants' reply to plaintiffs' response to defendants motion for summary judgment.[48] Plaintiffs argue that defendants' reply violates District of Kansas Rule 206(c). Specifically, plaintiffs object to defendants' reargument of issues addressed in defendants' motion for summary judgment and citation to facts not included in defendants' motion for summary judgment.

Plaintiffs point the court to no pertinent authority in support of their objection. Rule 206(c) does not support their objection. Rule 206(c) sets forth the procedure to be followed when moving for summary judgment in this District. Contrary to plaintiffs' assertions, it does not preclude defendants from replying in the manner they did. Defendants, as movants, were entitled to reply after plaintiffs served them with a statement in opposition. D.Kan.Rule 206(b). That defendants' reply contained arguments previously made in their motion for summary judgment and facts not listed in their summary judgment motion's statement of uncontroverted facts does not violate Rule 206(c). In replying to a nonmovant's statement in opposition, a movant points to the merits of his original arguments as compared to those presented in opposition by the nonmovant. This is the purpose of a reply and this is what defendants did. Defendants did not, as plaintiffs contend, merely rehash their original motion. Similarly, a movant is justified in presenting additional facts challenging those presented by the nonmovant. Defendants merely responded to the facts presented by plaintiffs in their statement in opposition. Rule 206(c) does not forbid this. In short, plaintiffs argument is unsupported and without merit.[49]

---

47. She provides the list of averages in her second affidavit. In this affidavit, she makes vague references to unidentified documents. She then provides a list of five "averages" amounting to nothing more than an unexplained interpretation of the unidentified documents.

48. Plaintiffs' objection amounts to a motion to strike. As such, there is no procedural basis for plaintiffs' objection. *See Jones v. City of Topeka,*

764 F.Supp. 1423, 1425 (D.Kan.1991) (noting that motions to strike can be directed only at pleadings, not motions for summary judgment). However, the court examines defendants' reply to see if it is properly before the court. *Cf. Id.*

49. In their reply (Doc. 204), plaintiffs also state a Rule 206(c) objection to defendants' response to plaintiffs' motion for summary judgment. Specifically, plaintiffs attack the manner in which

**834**

## IV. CONCLUSION

As previously noted, plaintiffs claim the following: (1) sex discrimination; (2) violation of ERISA; (3) discrimination in violation of Minnesota Statutes Chapter 62A; (4) breach of employment contract; (5) intentional infliction of emotional distress; and (6) tortious interference with prospective business advantage.

Defendants move for summary judgment as to each of the six numbered claims. Defendants' motion is granted in part and denied in part. Specifically, as to the sex discrimination claims, defendants' motion is granted in part and denied in part; as to the ERISA claims, defendants' motion is granted in part and denied in part; as to the claims based on Minnesota Chapter 62A, defendants' motion is granted; as to the breach of employment contract claim, defendants' motion is granted in part and denied in part; as to the two intentional infliction of emotional distress claims, defendants' motion is granted; and as to the tortious interference with prospective business advantage claim, defendants' motion is granted.

Plaintiffs move for summary judgment as to only claims (1)–(4). Plaintiffs' motion is denied.

Plaintiffs also object to defendants' reply to plaintiffs' response to defendants' motion for summary judgment. Plaintiffs' objection is denied.

**IT IS BY THE COURT THEREFORE ORDERED** that defendants' motion for summary judgment (Doc. 188) is granted in part and denied in part as set forth herein.

**IT IS FURTHER ORDERED** that plaintiffs' motion for summary judgment (Doc. 190) is denied as set forth herein.

**IT IS FURTHER ORDERED** that plaintiffs' objection (Doc. 210) is denied.

defendants controvert plaintiffs' statement of uncontroverted facts. Rule 206(c) states that a memorandum in opposition shall begin with a section controverting the movant's statement of facts. In their response, defendants began with a general discussion of the extensive factual statement plaintiffs submitted with their motion (plaintiffs' fact statement contained 458 numbered paragraphs, not including subparagraphs, which consumed nearly 50 pages of their memorandum). Defendants then referred to an attachment in which they set out, by numbered fact, their contentions as to each fact. Contrary to plaintiffs' assertions, defendants attachment is sufficient under Rule 206(c), especially considering the overwhelming quantity of facts to be addressed. The attachment sets out with particularity, and as to each numbered fact, whether defendants controvert that fact and, if so, on what grounds. Furthermore, contrary to what plaintiffs appear to argue, the court is not required to accept as established all of their "facts," even if left uncontroverted, if those "facts" have no basis in the record or are based on a misstatement of the record. Thus, to the extent plaintiffs object to defendants' response, their objection is without merit.